STATE

v.

**Edward D. HUMPHREY.**

No. 96–150–C.A.

Supreme Court of Rhode Island.

July 15, 1998.

---

Jane M. McSoley, Aaron L. Weisman, Providence, for plaintiff.

Catherine A. Gibran, Paula Lynch Hardiman, Paula Rosin, Providence, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER and FLANDERS, JJ.

## OPINION

BOURCIER, Justice.

This case comes before us on the defendant's appeal from judgments of conviction following a jury trial in the Washington County Superior Court on eight separate criminal offenses in connection with the near fatal shooting of John D. Lemont, a Rhode Island State Police Trooper, on October 15, 1994.

### I

### Facts and Travel

Late in the afternoon of October 15, 1994, Trooper John D. Lemont (Trooper Lemont) of the Rhode Island State Police was on routine patrol near a highway construction site on Route I–95 in the town of Richmond. Due to the highway road construction in the area, traffic was confined to a single low speed lane and moving at a stop-and-go pace. As Trooper Lemont stood in the breakdown lane, speaking with State Police Trooper Richard C. Ryan (Trooper Ryan), he noted the approach of an oncoming dilapidated orange and red painted pickup truck missing the required front license plate. Trooper Lemont then left in his marked State Police

vehicle to pursue the pickup truck and to determine from its driver if the truck was properly registered. Trooper Lemont overtook the pickup truck and activated his police vehicle's overhead lights. The driver of the pickup truck responded by turning into the highway breakdown lane and stopping. Trooper Lemont parked his police vehicle some fifteen to twenty feet behind the stopped pickup truck and alighted from the police vehicle. As he approached the driver's side window, the driver, later identified as Edward David Humphrey (defendant), a bearded white male with bushy hair wearing a bandanna and a black leather jacket, suddenly reached out, holding a semiautomatic Colt .45 handgun and fired one shot directly into Trooper Lemont's stomach. The bullet passed through Trooper Lemont's stomach, sliced the duodenum, passed through his renal arteries, and exited through the muscles of his back. Trooper Lemont fell, bleeding profusely, to the ground. The defendant then sped away in the pickup truck. As he did, Trooper Lemont was able to draw his police revolver and fire several shots at the fleeing pickup truck, none of which struck the defendant driver.

The defendant, in an attempt to flee and to avoid detection, proceeded south on Route I–95 and exited at the first exit onto Route 138, where he drove into the parking lot of a nearby shopping mall. He then quickly began to wipe down the truck shift, its windows, and its steering wheel in order to remove his fingerprints. Then, with the Colt .45 handgun concealed in his pants, he ran from the pickup truck into a nearby store located in the mall complex where he attempted to avoid detection. After a short time in the store he left and sprinted toward a wooded area behind the mall to conceal himself.

Unfortunately for the defendant, Rhode Island State Police Trooper David J. Hayden (Trooper Hayden) had observed the parked pickup truck and was approaching the mall area where it was parked when the defendant made his dash for the woods behind the

mall. Trooper Hayden exited his police cruiser and gave chase, and when about twenty-five feet behind the fleeing defendant, Trooper Hayden ordered the defendant to halt and lay down the Colt .45 weapon that the defendant had by now taken from his pants. The defendant, instead of obeying the trooper's command, began firing at the trooper. An exchange of gunfire followed, and the defendant ran around the corner of a building and disappeared from Trooper Hayden's view. The defendant then threw his Colt .45 weapon up onto the roof of a nearby Cost Plus store building and attempted without success to procure a ride from the scene from a departing shopper. At that time, Trooper Ryan, responding to the shooting, arrived on the scene. He exited his cruiser and with gun drawn ordered the defendant to stop and to raise his hands. Because the defendant had earlier disposed of his Colt .45, he was unarmed and obeyed Trooper Ryan's command. As he did, Trooper Hayden, unaware that the defendant had thrown the Colt .45 onto the nearby Cost Plus store roof and believing him to be still armed, tackled the defendant to the ground and handcuffed him. The defendant was then taken by Troopers Hayden and Ryan in Trooper Hayden's police vehicle to the Hope Valley State Police Barracks.[1]

The defendant upon his arrival at the Hope Valley Barracks was placed by Troopers Hayden and Ryan in the barrack's conference and detention room. That room was used to detain and question crime suspects. It was serviced by a wall-ceiling video camera so that suspects, while alone in the room, could be monitored, and it had several eyebolts set into the wall, about waist high, to which suspects, while handcuffed, could be secured for security purposes.

The defendant, upon his arrival at the barracks shortly after 5 p.m., was left in the conference room alone for about thirty minutes while the State Police were preparing to question him and learn his identity. At about 5:30 p.m. Lieutenant Robert Powers,

---

1. While all was transpiring at the shopping mall, emergency medical treatment to save Trooper Lemont's imperiled life was taking place. The trooper was taken to the Westerly Medical Center where he underwent some eight hours of emergency surgery and was fortunately able to survive.

the acting division commander, Lieutenant George A. Cuddy (Lieutenant Cuddy), the barrack's patrol commander and Sergeant Richard F. Quinn entered the conference room for the purpose of reading and advising the defendant of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and also to strip search him in order to ascertain if he was concealing any weapons or contraband. Trooper Hayden, one of the arresting troopers, was also present in the room and positioned at the conference room door. In accordance with State Police policy all four State Police personnel were unarmed. Lieutenant Cuddy advised the defendant of his *Miranda* rights, and the defendant affirmed that he was aware of and understood those rights.[2] He was then asked by Lieutenant Cuddy to identify himself and to tell whether he had used more than one gun during the shopping mall shootout with Trooper Hayden. The defendant replied that he had used only the single .45 caliber handgun. The defendant identified himself, gave his date of birth, his Social Security number, and his place of residence. His clothes, except for boxer shorts, were removed in order to secure them as evidence and to allow for a complete search for any weapons. It was observed and noted that he had a small cut over one eye, a small cut on his lip, and scrapes on both knees, all resulting from his forcible arrest by Trooper Hayden at the shopping mall. The defendant was then again left alone in the conference room. He was left placed in leg restraints to restrict his movement in the room, and his handcuff securing one arm was attached to a nearby wall eyebolt next to the chair on which the defendant was seated beside the conference room table.

At approximately 6 p.m. Detective Corporals Michael P. Iarossi (Detective Iarossi) and Steven Pare (Detective Pare) of the Rhode Island State Police were assigned to interview the defendant. Upon entering the conference room, Detectives Iarossi and Pare noted that the defendant was seated at the conference room table while his legs remained confined within leg restraints and that the handcuff securing only one of his arms remained attached to an eyebolt in the wall. The detectives then moved the defendant to a different section of the conference room, reattached his one handcuff to a different wall eyebolt, allowed the defendant to seat himself, and then seated themselves around the conference table. At this time Detective Pare informed the defendant of his *Miranda* rights. The defendant acknowledged, as he had done previously, that he understood those rights and that he had previously been informed of these same rights during prior police arrests. The defendant was then provided with bottled drinking water and a cigarette. From approximately 6 p.m. until shortly before 10 p.m., Detectives Iarossi and Pare conducted an informal general interview during which they questioned the defendant in detail concerning his background, life history, prior criminal conduct, prior periods of incarceration, the events of October 15, 1994, surrounding the shooting of Trooper Lemont, and his activities on the previous day, October 14, 1994. The detectives also explored the defendant's motive for shooting Trooper Lemont and his attempted escape and ensuing gun battle with Trooper Hayden. The defendant freely admitted that he had shot Trooper Lemont and that he had attempted to shoot Trooper Hayden. Following this four hour interview, the defendant's hands were swabbed by detectives from the Bureau of Criminal Identification. Next, the defendant was escorted to the restroom and provided with more bottled drinking water. He was told that a formal tape recorded interview would be conducted after a short break. The defendant at this time requested no food nor was he offered any.

At approximately 10:05 p.m., Detectives Iarossi and Pare initiated the formal, tape recorded interview with the defendant. At the beginning of this tape recorded interview the defendant was once again advised of his rights under *Miranda,* and once again he acknowledged that he understood these rights. The defendant then proceeded to execute a written waiver of his rights, initial-

---

2. The defendant had been previously convicted in Rhode Island of armed robbery and at the time of his arrest was the subject of arrest warrants issued in both Massachusetts and New Hampshire for alleged parole violations. His criminal record was lengthy.

ing each of the enumerated rights listed on the waiver form. Over the next two hours, the defendant provided a detailed confession during which he admitted his culpability for the shooting of Trooper Lemont. The defendant further confessed to his fleeing the scene of that shooting and subsequently engaging in a gun battle with Trooper Hayden. During the course of his tape recorded confession, the defendant was questioned concerning his motive for shooting Trooper Lemont, and the following exchange ensued:

"Q Mr. Humphrey, getting back to an earlier question we asked you, why were you carrying the firearm in your vehicle?

"A Cause I ain't gonna go back to—didn't think I was gonna go back to prison.

"Q And it was your understanding that there was a parole violation warrant out for your arrest?

"A Yes.

"Q And what were your plans should you have been stopped by a police officer?

"A To either get away or make them shoot me.

"Q And was it your—was it your intention to shoot it out with any police officer who may have stopped you?

"A Yes.

"Q I'm sorry, we couldn't hear you.

"A Yes.

"Q And is that exactly what happened today?

"A Yes.

"Q Is it fair to say you shot that police officer because you did not want to go back to prison?

"A Exactly."

The defendant further told his questioners that he had previously been convicted of armed robbery in 1984 within the State of Rhode Island and that at the time of the shooting of Trooper Lemont he was the subject of arrest warrants issued in both Massachusetts and New Hampshire for alleged parole violations.

By approximately midnight, the defendant had completed his recorded confession. He was then left alone in the conference room with one handcuff still attached to the wall

and his feet secured together for the remainder of the night. No blanket or any clothing was provided to him, and he was then only garbed in his T-shirt and boxer shorts. The next morning, at approximately 7 a.m., the defendant was requested to sign a typewritten transcription of his recorded confession that had been transcribed and typewritten during the early morning hours which he did. Later that same day he was transported to the Adult Correctional Institutions (ACI) where he was examined for any physical injuries and admitted. On October 17, 1994, at 8 p.m., while still incarcerated at the ACI, the defendant requested medical attention because of allegedly recurring pain in his tailbone area. Ten days later, he was examined by Tej Varna Bansal, M.D. (Dr. Bansal), a physician employed at the ACI. Doctor Bansal noted that the defendant was ambulating well and did not seem to be in any physical distress. The doctor noticed however that the defendant was sitting a "little funny," and in order to treat the pain of which the defendant complained the doctor prescribed Motrin, a pain reliever medication. On November 1, 1994, an X-ray taken at the ACI medical facilities indicated that the defendant may have suffered a nondisplaced fracture of the first coccygela segment or tailbone. There was no finding by Dr. Bansal, however, regarding when or how that potential injury may have occurred.

On November 1, 1994, the defendant was charged by criminal information filed in the Washington County Superior Court with ten separate offenses: two counts of assault with intent to murder, unlawful discharge of a firearm from a motor vehicle, possession of a firearm after having been convicted of a crime of violence, carrying a handgun without a license, obliterating the mark of identification upon a firearm, theft of goods valued at under $500, resisting arrest, operating a motor vehicle so as to elude a police vehicle, and driving at a time when his application for a license had been refused.

Prior to trial, the defendant filed motions to sever the charge of possession of a firearm after having been convicted of a crime of violence as well to suppress his confession. In support of his motion to sever, the defen-

dant asserted that the evidence that the state would introduce in order to establish his former violent criminal background would unfairly cause the trial jury to conclude that he was guilty of shooting Trooper Lemont simply because he had acted in conformity with his past violent behavior. The trial justice denied the defendant's motion to sever stating:

"I'm not inclined to sever count 4 [possession of a firearm after having been convicted of a crime of violence] at this point, and I'll tell you why. The defendant had a motive to shoot the police officer, and that motive, if proven, was not to return to prison because he was on parole. That is fairly obvious from these motions in this proceeding, thus, under the case of *State v. Cline*, the fact that the defendant had been in prison and was on parole is inextricably linked to *** his charge of shooting Trooper Lemont."

During the preliminary hearing held on the defendant's motion to suppress, the defendant testified that he had not voluntarily given the challenged confession but rather that he had been beaten and coerced into admitting to the shooting of Trooper Lemont. He also alleged that his requests for counsel had gone unheeded by his State Police interrogators, Detectives Iarossi and Pare. The defendant also alleged that Troopers Ryan, Hayden, and other unidentified State Police personnel had beaten and kicked him soon after his arrival at the Hope Valley Barracks. The defendant alleged that after the initial beatings, the State Police personnel who were then present ripped his clothes off and secured him to a conference room wall leaving him in an uncomfortable position. Later, during the interview with Detectives Iarossi and Pare, the defendant alleged, he again asserted his Sixth Amendment right and also requested the assistance of counsel each time that the interrogators questioned him concerning any of the events of that day that had precipitated his arrest. He testified that when he requested the assistance of legal counsel, the interviewing detectives, Iarossi and Pare, would ignore his request and simply steer their questioning toward more innocuous background topics only to return each time to the events surrounding the shooting of Trooper Lemont. Finally, the defendant testified, the interrogating State Police detectives at one point became impatient with his lack of cooperation and threatened to allow the other State Troopers who had allegedly previously beaten him to return to the conference room if he did not answer their questions concerning the shooting of Trooper Lemont.

The trial justice, at the conclusion of the suppression hearing, denied the defendant's motion to suppress his confession. In support of her decision the trial justice stated that "[t]here is no question in the Court's mind that this defendant was advised of his *Miranda* rights on more than one occasion, and that it was not the first time that he had heard those rights." The trial justice further found that the defendant fully understood his *Miranda* rights and had knowingly and intelligently waived them. In resolving the conflict between the testimony from the defendant and the many State Police personnel who had testified, the trial justice rejected as not worthy of belief the defendant's claims of abuse and brutality. The trial justice based her factual findings as to the defendant's credibility on two grounds. First, the physical evidence presented did not substantiate the defendant's claims of brutality and, second, the defendant's testimony was so evasive and vague as not to be believable in the face of the more credible and consistent testimony presented by the State Police personnel who had testified during the suppression motion hearing. The trial justice did, however, order that certain irrelevant statements be redacted from both the transcript and the tape recording of the defendant's confession.

On March 28, 1995, the defendant's jury trial commenced. Numerous civilian eyewitnesses, the many State Police personnel involved in the two shooting incidents and ensuing investigations, and Dr. Bansal, among others, testified. The testimonial and physical evidence presented during the jury trial overwhelmingly established the defendant's guilt beyond a reasonable doubt on the charges concerning the shooting of Trooper Lemont and the ensuing chase and gunfight with Trooper Hayden. During the trial Trooper Lemont himself testified that at the

time that he was shot, he was standing only five to six feet from his assailant and, in light of the clear, sunny weather and lack of any obstruction, that he could clearly see the shooter's face and body. Trooper Lemont unequivocally and positively identified the defendant as his assailant. The state also introduced into evidence both the redacted transcript and the redacted tape recording of the defendant's confession made to Detectives Pare and Iarossi on the night of the shooting.

Following the presentation of the state's evidence at trial, the defendant moved for a judgment of acquittal on the charge of theft of goods valued at under $500, and this motion was granted. Later, on April 6, 1995, the trial jury returned guilty verdicts on all the remaining counts except for one, that being the charge of obliterating the mark of identification upon a firearm. On that charge the defendant was acquitted. The defendant's motion for a new trial was denied on April 19, 1995.

On May 18, 1995, the trial judge, sitting without a jury, heard the state's motion to enhance the defendant's sentence pursuant to G .L.1956 § 12–19–21,[3] the habitual criminal statute. In support of its motion the state offered copies of four previous judgments of conviction and commitments of imprisonment against the defendant. These documents established that the defendant had previously been convicted of robbery in 1982 and of armed robbery in 1983 in the State of New Hampshire and, while serving his sentence for the armed robbery conviction, escaped and committed an armed robbery in Massachusetts and yet another armed robbery in Rhode Island. All four of these misdeeds resulted in prison terms for the defendant, and accordingly the trial justice determined that the defendant was a habitual criminal subject to sentence enhancement pursuant to § 12–19–21.

On May 25, 1995, the defendant was sentenced to eighty-one years to serve with an additional thirty-one years suspended and as-

sessed a $1,000 fine. The defendant was ordered to serve the eighty-one years of sentences consecutively to any other sentences to be served in connection with any other convictions from any other jurisdictions. In sentencing the defendant to some eighty-one years in prison, the trial justice augmented the sentence that had been imposed for the first count of assault with intent to murder by twenty-five years and then further augmented the defendant's sentence for the second count of assault with intent to murder by an additional five years, acting allegedly pursuant to §12–19–21 because the defendant was determined to be a habitual criminal. The defendant now appeals.

In his appeal, the defendant raises three claims of error. First, the defendant claims that the motion justice erred in denying his motion to suppress his confession. The defendant also claims that the motion justice erred in denying his motion to sever the charge of possession of a handgun after having previously been convicted of a violent crime. Finally, the defendant claims that the trial justice misapplied the habitual criminal sentence enhancement statute and erroneously enhanced both his sentence for the first count of assault with intent to murder and his sentence for the second count of assault with intent to murder. The defendant asserts that the habitual criminal sentence enhancement statute does not permit the enhancement of multiple sentences imposed at the same time for offenses charged in a single criminal information.

II

The Motion to Suppress

The defendant first challenges the trial justice's denial of his motion to suppress his confession. In his appeal, the defendant urges this Court to consider two different positions in regard to the voluntariness of his confession. First, he asserts that, based upon his version of the events which transpired within the conference room at the

---

3. General Laws 1956 § 12–19–21(a), entitled "Habitual criminals," provides that "[u]pon conviction, the person deemed a habitual criminal shall be punished by imprisonment in the adult correctional institutions for a term not exceeding twenty-five (25) years, in addition to any sentence imposed for the offense of which he or she was last convicted."

State Police Hope Valley Barracks, his confession was involuntary and therefore inadmissible at his jury trial. In the alternative, the defendant asserts that even if we accept the trial justice's findings as to the historical facts relevant to the voluntariness of his confession, we must nonetheless find as a matter of law that his confession was coerced and therefore inadmissible. As to the relief sought, the defendant contends that the admission of his involuntary confession at trial necessarily led to his conviction and requires the vacation of his convictions and the grant of a new trial. We disagree.

■ In reviewing a trial justice's decision on a motion to suppress a confession that is claimed to be involuntary, we perform a two-step analysis. First, we review the trial justice's findings regarding the historical facts relevant to the voluntariness of the challenged confession. Next, we apply those historical facts and review the trial justice's determination as to the voluntariness of the challenged confession de novo. *Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *State v. Campbell,* 691 A.2d 564, 569 (R.I.1997).

In performing the first step of the analysis and assessing the historical facts as a basis for determining voluntariness of a confession, we look to the words of Mr. Justice Frankfurter in *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961).

"Determination of what happened requires assessments of the relative credibility of witnesses whose stories, in cases involving claims of coercion, are frequently, if indeed not almost invariably, contradictory. That ascertainment belongs to the trier of facts before whom those witnesses actually appear, subject to whatever corrective powers a State's appellate processes afford." *Id.* at 603, 81 S.Ct. at 1879, 6 L.Ed.2d at 1058.

■ This Court will not overturn a trial justice's findings of historical fact relevant to the voluntariness of a confession unless such findings are clearly erroneous. *State v. Bailey,* 677 A.2d 407, 410 (R.I.1996). " 'A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the basis of the entire evidence is left with

the definite and firm conviction that a mistake has been committed.' " *State v. Baton,* 488 A.2d 696, 701 (R.I.1985) (quoting *State v. LaRosa,* 112 R.I. 571, 576, 313 A.2d 375, 377 (1974)).

The defendant's principal claim in support of his motion to suppress is that he was not given his *Miranda* rights as claimed by the Rhode Island State Police and that he was kicked, beaten, and otherwise coerced into signing a confession. In denying the defendant's motion to suppress, the trial justice found as a matter of historical fact that the defendant was informed of his Fifth and Sixth Amendment rights and that the defendant voluntarily and knowingly waived these rights. The trial justice further found that the defendant was neither coerced nor induced into confessing to the shooting of Trooper Lemont and that the defendant's assertions that he had been brutally beaten were unfounded and unsupported by the evidence. Finally, the trial justice found that the State Police who arrested and questioned the defendant and eventually obtained his confession acted in a restrained and professional manner throughout the events in question.

■ We cannot say that these findings are clearly erroneous. Indeed, the trial justice's determination as to the historical facts relevant to the voluntariness of the defendant's confession seems firmly grounded on the credible and consistent testimony of the State Police personnel involved in the capture, arrest, and interrogation of the defendant. The transcript and tape recording of the defendant's confession depicts rational, calm questioning rather than the "torture chamber" scenario which the defendant attempted to depict in his motion hearing testimony. Upon listening to the recording of the defendant's confession, we are struck by the calm, detached quality of his voice. *See Vargas v. Brown,* 512 F.Supp. 271, 277 n. 7 (D.R.I.1981). During the approximately two-hour long interview, the defendant alludes to no physical abuse and, indeed, seems strangely comfortable in light of the events that had transpired earlier that day. Further, we note that much of the allegedly

harsh treatment of which the defendant complains actually is alleged to have occurred *after* his confession of guilt had already been made and completed. As such, we need not consider the State Police's alleged treatment of the defendant from midnight after his arrest until his transport the next day to the ACI. While such if proven might permit and provide for a possible civil damages remedy, that would not affect the constitutional validity of his voluntary confession and subsequent convictions.

Accordingly, after a careful examination of the record, we cannot say that the decision of the trial justice was clearly wrong or that she misconceived the evidence or the law applicable thereto. She "had an opportunity to see the witnesses and observe their demeanor as they testified, and therefore had the advantage, which we do not have, of determining where the truth lay." *Migliaccio v. A. & S. Angolano, Inc.,* 87 R.I. 194, 203, 139 A.2d 383, 388 (1958).

Having reviewed the trial justice's determination as to the historical facts relevant to the voluntariness of a confession, this Court undertakes a second analysis and exercises its independent judgment in determining whether those historical facts establish a deprivation of constitutional rights. *Miller v. Fenton,* 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405, 411 (1985).

 "Both the Rhode Island and the Federal Constitutions bar the use in a criminal trial of a defendant's involuntary statements." *State v. Griffith,* 612 A.2d 21, 25 (R.I.1992). In order to admit a defendant's confession at trial, the state must establish by clear and convincing evidence that the confession was made after the defendant knowingly and intelligently waived his or her rights under *Miranda, State v. Smith,* 602 A.2d 931, 935 (R.I.1992) (citing *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)), and that the confession was made voluntarily. *State v. Malone,* 568 A.2d 1378 (R.I.1990).

▪██ A defendant's statement is voluntary when it is "'the product of his free and rational choice.'" *State v. Amado,* 424 A.2d 1057, 1062 (R.I.1981) (quoting *Greenwald v. Wisconsin,* 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77, 80 (1968)).

 A statement is involuntary if it is extracted from the defendant by coercion or improper inducement, including threats, violence, or any undue influence that overcomes the free will of the defendant. *Griffith,* 612 A.2d at 25. The determination of whether or not a confession was freely and voluntarily made must be made in light of the totality of the circumstances surrounding the challenged statement. *State v. Pacheco,* 481 A.2d 1009, 1026 (R.I.1984).

 Applying this law to the historical facts found by the trial judge in this case, we find that the defendant's confession was voluntary and was not the product of the defendant's overborne free will. The defendant was properly informed of his rights under *Miranda* and, indeed, executed a written waiver upon which he initialed each individual prophylactic warning. The defendant further stated that he was familiar with his *Miranda* rights because he had been informed of them during his many previous arrests. *See United States v. Cruz Jimenez,* 894 F.2d 1, 8 (1st Cir.1990) (valid waiver when suspect arrested five times before). Following this valid waiver of rights, the defendant was given water to drink and a cigarette to smoke and was then interviewed for four hours during which Detectives Iarossi and Pare explored numerous topics besides the dramatic and near tragic events of that particular day. Following this preliminary interview, the defendant was again afforded a break, during which he was again given water and escorted to the restroom. Next, the detectives tape recorded a two-hour interview with the defendant wherein they succinctly explored only those areas which they deemed relevant or nearly relevant to their investigation. This interview lasted approximately two hours.[4] The defendant's com-

---

4. The defendant has attempted to liken his detention and interrogation by Detectives Iarossi and Pare to that condemned in *McNabb v. United States,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). We find little similarity. In *McNabb,* the defendants there, none of whom had ever gone beyond fourth grade education, or had ever been away from home, were suddenly arrested in

plaint that the manner in which he was disrobed and restrained render his confession involuntary is not persuasive. Rather, we find that the strip search, while not conducted in the most mild mannered fashion, was not so shocking to the conscience as to impugn the voluntary nature of the defendant's subsequent confession. Further, the restraints that were placed upon the defendant were no more confining or inhumane than those that are placed on prisoners from the ACI who appear before this Court pro se to present their own appeals. Photographs of the defendant that were taken while he was confined in the conference room reveal that the wall eyebolt was not above the defendant's head, restrained only one of his arms, and was parallel with his shoulders while he was seated. This positioning allowed the defendant to sit reasonably comfortably while he remained confined to a small area. This confinement was necessary in order to keep the defendant within view of the video camera, which in turn allowed the State Police to monitor him without entering the conference room itself. We further note that the photographs taken of the defendant reveal that the "shackles" of which he complains are little more than the leg irons that are commonly utilized to secure both federal and state prisoners for security purposes. We have no doubt that the police were more than justified in taking these precautions in light of the murderous crimes that they had every reason to believe the defendant had committed. As to the defendant's allegation that he was somehow humiliated by the police's failure to provide him with additional clothing, we once again refer to the photographs entered into evidence by the state. They clearly depict that the defendant remained clothed in a T-shirt and boxer shorts that closely resemble a pair of shorts. We further note that no state police personnel of the opposite sex were allowed to view the defendant in this state of partial undress prior to the completion of his confession. Therefore, while we do not condone the State Police's failure to more fully clothe the defendant after having

removed the clothes that he wore when he attempted to kill two State Troopers, we conclude that forcing him to remain in a T-shirt and boxer shorts was not so humiliating as to nullify the voluntary nature of the defendant's confession. Finally, we note once again that most of, if not all, the alleged harsh treatment of which the defendant complains occurred after midnight following the day of his arrest and after he had given his confession to State Police Detectives Iarossi and Pare. We shall not consider the coercive nature of this treatment because we conclude that it could not, as a matter of law, have impacted upon the defendant's previous decision to confess to the shooting of Trooper Lemont.

As a final matter, we note that even if we had concluded that the defendant's confession was involuntary or coerced, we would not necessarily be compelled to vacate his convictions and grant a new trial. *In Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the United States Supreme Court explicitly distinguished the trial error of admission of an involuntary confession from those structural constitutional deficiencies that per se require a new trial. Chief Justice Rehnquist, writing for the Court, stated:

"It is evident from a comparison of the constitutional violations which we have held subject to harmless error, and those which we have held not, that involuntary statements or confessions belong in the former category. The admission of an involuntary confession is a 'trial error,' similar in both degree and kind to the erroneous admission of other types of evidence. The evidentiary impact of an involuntary confession, and its effect upon the composition of the record, is indistinguishable from that of a confession obtained in violation of the Sixth Amendment—of evidence seized in violation of the Fourth Amendment—or of a prosecutor's improper comment on a defendant's silence at trial in violation of the Fifth Amendment. *When reviewing the erroneous admission of an involun-*

the middle of the night at their home, not brought before a judicial officer to determine justification for their arrest and detention, and then put into a barren cell and kept there for

fourteen hours in complete seclusion and thereafter, for two days, subjected to unremitting questioning by numerous officers. 318 U.S. at 344–45, 63 S.Ct. at 615, 87 L.Ed. at 826.

tary confession, the appellate court, as it does with the admission of other forms of improperly admitted evidence, simply reviews the remainder of the evidence against the defendant to determine whether the admission of the confession was harmless beyond a reasonable doubt." *Id.* at 310, 111 S.Ct. at 1265, 113 L.Ed.2d at 331–32. (Emphasis added.)

In order to conduct a harmless error analysis of the introduction of an involuntary confession, the offending statement must be "quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]." *Brecht v. Abrahamson,* 507 U.S. 619, 629, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353, 367 (1993) (quoting *Fulminante,* 499 U.S. at 307–08, 111 S.Ct. at 1264, 113 L.Ed.2d at 330).

In performing that assessment of the other evidence presented, we find that the unanimous, overwhelming, and compelling nature of the evidence against the defendant in this case rendered harmless the evidentiary impact of his suggested involuntary confession and could not in any reasonably foreseeable manner have affected the outcome of the defendant's trial. During the defendant's trial, the prosecution introduced eyewitness after eyewitness after eyewitness to the shooting of Trooper Lemont, and without exception each witness conclusively identified the defendant as the shooter. Even more damning, both Troopers Ryan and Hayden offered credible, compelling testimony of their encounters with the defendant that undeniably established his role in the charged crimes. Finally, and most importantly, the defendant's victim, Trooper Lemont, survived the murderous assault and lived to testify against and to point his finger directly at his would be murderer. During the course of that testimony Trooper Lemont unequivocally identified the defendant as the man who had shot him. In the face of that overwhelming and uncontradicted evidence that unequivocally and overwhelmingly established the defendant's guilt in this case beyond any reasonable doubt, we are confident that even if we had found the defendant's confession to have been involuntary, it could not have had the requisite impact upon

the outcome of his trial for us to vacate his convictions. In matter of fact, the defendant's confession was totally unnecessary for conviction in view of the eyewitness trial evidence introduced by the state.

This case is therefore factually distinguishable from *Fulminante* in which the United States Supreme Court determined that the admission of a coerced confession was not harmless error but rather necessitated a reversal of that defendant's convictions. In that case the prosecution had introduced two separate confessions by the defendant, one of which was the product of coercion by a paid Federal Bureau of Investigation informant. The Court found that "the State recognized that a successful prosecution depended on the jury believing the two confessions. Absent the confessions, it is unlikely that Fulminante would have been prosecuted at all, because the physical evidence from the scene and other circumstantial evidence would have been insufficient to convict." *Fulminante,* 499 U.S. at 297, 111 S.Ct. at 1258, 113 L.Ed.2d at 323. The prosecution in the case now before this Court possessed monumentally damning and inculpatory evidence that was far greater than the limited amount that hindered the prosecution in *Fulminante.* It is not possible to reasonably imagine that the prosecution of the defendant in this case would not have gone forward or would have resulted in an acquittal but for the admission of the challenged confession.

Accordingly, while we find that the defendant's confession was given of his own free will, we further find that even if that confession had been given involuntarily, its admission at trial would, beyond any reasonable doubt, constitute mere harmless error. Therefore, the trial justice's denial of the defendant's motion to suppress his confession was not error.

### III

### The Motion to Sever

Rule 8(a) of the Superior Court Rules of Criminal Procedure provides that two or more offenses may be charged in the same indictment, information, or complaint "if the offenses charged *** are of the same

or similar character or are based on the same act or transaction or on two (2) or more acts or transactions connected together or constituting parts of a common scheme or plan." Notwithstanding Rule 8, a criminal defendant may move for severance pursuant to Rule 14 of the Superior Court Rules of Criminal Procedure so that all the charges brought against him or her will not be tried together. It is well settled that "a defendant is not entitled to a severance as a matter of right" and that the granting or the denying of a defendant's motion to sever lies within the sound discretion of the trial justice. *State v. Tarvis*, 465 A.2d 164, 172 (R.I.1983). "To prevail in demonstrating that a trial justice has abused this discretion, a defendant must show that the trial justice's denial of the motion to sever prejudiced the defendant to such a degree that he or she was denied a fair trial." *State v. Eddy*, 519 A.2d 1137, 1140 (R.I.1987) and that he "did, in fact, suffer prejudice sufficiently substantial to impinge upon his right to a fair trial." *State v. Sharbuno*, 120 R.I. 714, 717, 390 A.2d 915, 917 (1978) (citing *State v. Patriarca*, 112 R.I. 14, 308 A.2d 300 (1973)).

■ In this case the defendant stated in his confession that his motive for shooting Trooper Lemont was to avoid returning to prison. In order to fully develop the defendant's confession motive assertion for the trial jury, the state quite properly presented the jury with evidence of the defendant's prior criminal history in order to prove that the inclusion in his confession of why he shot Trooper Lemont was in fact accurate and factually supported by the defendant's knowledge of the outstanding parole violation warrants then pending against him.

■ Even assuming that the defendant's criminal history should not have been admitted, its erroneous introduction could not in any manner have resulted in the prejudice required to necessitate a new trial. No reasonable jury would have ever concluded that it should convict the defendant of the serious crimes charged in this case merely because the defendant had previously been convicted of armed robbery. Rather it is only reasonable to conclude that the state's numerous eyewitness evidence accounts of the defen-

dant's shooting of Trooper Lemont and the defendant's subsequent unsuccessful escape attempt and attempt to shoot and murder Trooper Hayden led to the defendant's conviction. Indeed, Trooper Lemont's compelling and believable testimony alone would appear to have been sufficient to convict the defendant in this case. When Trooper Lemont's testimony is considered along with the plethora of other credible eyewitness testimony and physical evidence of the shooting that the state presented, it is beyond reason to even suggest that the limited evidence of the defendant's criminal past that the state introduced so swayed the jury that the defendant was denied a fair trial. Accordingly we affirm the denial of the defendant's motion to sever.

## IV

### The Habitual Criminal Sentence Enhancement

The defendant's final claim is that the trial justice improperly applied the habitual criminal sentence enhancement statute, § 12–19–21, in enhancing each of the two sentences imposed for his two convictions for assault with intent to murder. We agree.

■ We note at the outset that the defendant's challenge to the enhancement of two of his criminal sentences that were charged by way of a single criminal information calls upon us to construe the habitual criminal statute, § 12–19–21. "[W]hen the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1226 (R.I.1996).

■ We begin our analysis then with the plain language of the statute at issue. Section 12–19–21(a), entitled "Habitual criminals," defines the term "habitual criminal" as follows:

"[A]ny person who has been previously convicted in this state or any other state of two or more felony offenses arising from separate and distinct incidents and sentenced on two or more such occasions to

**1278**

serve a term in prison shall, after the convictions and sentences, be convicted in this state of any offense punished by imprisonment for more than one year, such person shall be deemed an 'habitual criminal.'"

The statute further provides that "[u]pon conviction, the person deemed a habitual criminal shall be punished by imprisonment in the adult correctional institutions for a term not exceeding twenty-five (25) years, *in addition to any sentence imposed for the offense of which he or she was last convicted." Id.* (Emphasis added.) In its application this statute plainly provides for the enhancement of a single criminal sentence, the one imposed for the single "triggering" offense of which a defendant was last convicted. Our reading of the statute reveals no provision that permits a sentencing judge to enhance sentences for more than the single "triggering" offense. Therefore, we conclude that the trial justice erred as a matter of law when she enhanced by five years the defendant's sentence for his second conviction for assault with intent to murder when she had already enhanced by twenty-five years the defendant's sentence for his first conviction for assault with intent to murder. Accordingly the additional five-year sentence enhancement imposed upon the defendant based upon his status as a habitual criminal is invalid.

For the foregoing reasons the defendant's appeal is sustained in part and denied in part. The five-year enhancement of the defendant's sentence for his conviction on the second count of assault with intent to murder is vacated. All other convictions and sentences are affirmed, and the papers in this case are remanded to the Superior Court.

GOLDBERG, J., did not participate.