**Supreme Court**

No. 2014-269-C.A.

(P1/09-1119A)

State                                    :

v.                                    :

Mustapha Bojang.                              :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                         :

v.                            :

Mustapha Bojang.              :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**  The defendant, Mustapha Bojang, appeals from his conviction of first-degree child molestation.  In this appeal, we revisit the defendant's argument that the statements he made after his arrest and during his interrogation at the Woonsocket Police Department should have been suppressed by the trial justice as the product of illegal coercion by the detectives who interrogated him.  For the reasons set forth below, we affirm the judgment of the Superior Court.

**I**

**Facts and Procedural History**

In State v. Bojang, 83 A.3d 526 (R.I. 2014) (Bojang I), this Court remanded this case to the Superior Court for additional factfinding and credibility determinations regarding both the events that transpired during an unrecorded portion of defendant's interrogation and the voluntariness of defendant's confession.  On remand, the parties waived their opportunity to present additional evidence, and the trial justice made oral findings of fact and credibility determinations based on his review of the testimony provided during both the hearing on defendant's motion to suppress and the jury trial.  In this section, we recount the facts and travel

- 1 -

of this case that are relevant to the present issues on appeal—namely, the testimony and evidence regarding defendant's interrogations and the statements that he made during these interrogations, as well as the travel of defendant's motion to suppress these statements. For a complete summary of the facts that led to defendant's conviction, we refer the reader to Bojang I.[1]

In the spring of 2009, a grand jury returned an indictment charging defendant with eight counts of first-degree child molestation, allegedly perpetrated against one of the young daughters of the friends with whom defendant was living at the time (the complainant), in violation of G.L. 1956 § 11-37-8.1. The defendant filed a motion to suppress the statements he had made after his arrest and during his interrogations at the Woonsocket Police Department, claiming that the statements were coerced and not made voluntarily. A trial justice of the Superior Court held a hearing over two days in April 2010, at which he heard extensive testimony from one of the detectives who had arrested and interrogated defendant as well as brief testimony from the patrolman who had transported defendant to the police station after his arrest.[2]

At the suppression hearing, Det. Kevin Hammann testified that, on February 2, 2009 at 9:40 p.m., he was one of two detectives who executed the arrest warrant for defendant at a residence in Woonsocket. Detective Hammann stated that defendant was calm throughout his arrest. Detective Hammann testified that defendant's interrogation was conducted in two parts:

---

[1] In State v. Bojang, 83 A.3d 526 (R.I. 2014) (Bojang I), we resolved the other two issues that defendant argued were errors made by the trial justice that required vacating his conviction. We held that the trial justice had not erred in either his evidentiary rulings or when he denied defendant's motion for a new trial. Id. at 540.

[2] Woonsocket Patrolman Anthony Conetta, Jr. testified that he had transported an "African male, approximately [five foot eight]" from East School Street to the police station, a journey that took "two minutes." Patrolman Conetta could neither definitively identify defendant as the male subject he had transported, nor recall any details from this transport. Patrolman Conetta denied assaulting, yelling at, or threatening the male subject; he asserted that he had "never done that in [his] career."

the first occurred at approximately 10:10 p.m. in a room that did not have video or audio recording equipment, and the second occurred at approximately 10:50 p.m. in a room that did have video recording equipment. Detective Hammann testified that this second interrogation was video-recorded in its entirety. Detective Hammann further testified that defendant read, initialed, and signed a form acknowledging his <u>Miranda</u> rights[3] (rights form) in each interrogation room before the detectives began asking questions. Detective Hammann also testified that defendant had not, at any point, either asked for an attorney, a break from the questioning, or for the detectives to stop the interrogation.

With respect to the first (unrecorded) interrogation, Det. Hammann testified that, after initially denying any sexual contact with the complainant, defendant admitted to kissing her one time and to inserting his finger in her vagina one time. According to Det. Hammann, these statements were made after he told defendant that the complainant had, that morning during an interview at the Child Advocacy Center, alleged repeated instances of rape. Detective Hammann admitted that he had spoken to defendant about his immigration status and that he had discussed calling the immigration authorities. According to Det. Hammann, the other detective in the room, Ronald LaBreche, was standing near the door during the first interrogation. Detective Hammann admitted that Det. LaBreche yelled at defendant at one point, but he also repeatedly stated that he could not recall many details of the first interrogation, such as whether Det. LaBreche swore at defendant several times. Detective Hammann admitted that "it [was] possible" that Det. LaBreche had banged on the table during the first interrogation. Detective Hammann denied that defendant was assaulted at any time during this first interrogation.

---

[3] <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).

Detective Hammann also testified that, after defendant admitted to some sexual contact with the complainant, defendant agreed to go to the room that was equipped with recording equipment. The video-recorded second interrogation (the DVD) was admitted during Det. Hammann's testimony. The first two minutes of the DVD showed defendant sitting alone at a table before the detectives entered. After the detectives entered the room, the DVD showed defendant reading, initialing, and signing a rights form. Next, the DVD captured an interrogation in which defendant admitted to three separate sexual encounters with the complainant, as well as to kissing her. The defendant specified that he had inserted his finger into her vagina one time, that he had rubbed her naked body on his naked body one time, resulting in his orgasm, and that he had rubbed her against him on another occasion when they were both fully clothed. The defendant denied any penile penetration. The DVD showed that the second interrogation ended approximately thirty minutes after it began and that defendant was again left alone in the room for approximately two minutes before he was instructed to follow someone (off camera) out of the room and the recording ended.

At the conclusion of the testimony, the trial justice rendered a bench decision denying defendant's motion to suppress, finding that the state had proven by clear and convincing evidence that defendant's confession was not the product of coercion and that defendant had "knowingly, intelligently, and voluntarily waived his constitutional rights." The trial justice noted that, based on Det. Hammann's testimony, defendant was in the first interrogation room for approximately thirty minutes and that defendant had signed the second rights form forty minutes after he had signed the first form. The trial justice also specifically commented on Det. Hammann's demeanor during the hearing:

> "The Court did notice before it was even pointed out by opposing
> counsel that there was a difference in dynamics timing responses

[sic] when [Det.] Hammann would respond to [the prosecutor], * * * as opposed to what was happening with [defendant's attorney], all of which leaves me wondering exactly what went on in interview room number one."

The trial justice also commented on the DVD of the second interrogation. He found that the detectives were visible at times, "albeit from the back sides * * *, so the [c]ourt was unable to see any facial expression." The trial justice described defendant's demeanor as "relaxed. He actually sat and twirled his thumbs, one around the other. He did not appear to be overly sensitive. He did not appear to be emotionally upset * * *. He did not appear apprehensive at that time * * *." The trial justice also noted that he had not observed defendant's hand shaking as defendant was reading the rights form, that defendant had not rubbed his head or "appear[ed] as if he had been wounded," and that defendant "became increasingly more comfortable as the interview progressed."

During the jury trial, Dets. Hammann and LaBreche as well as defendant testified about the interrogations. Detective LaBreche testified that defendant had not invoked any of the rights that were listed on the rights form. Detective LaBreche also testified that Det. Hammann asked most of the questions during the interrogations. Detective LaBreche admitted that, during the first interrogation, defendant had initially denied the allegations several times and that defendant had stated several times that he was innocent. Detective LaBreche further testified that, at one point, defendant was not paying attention to a question that Det. LaBreche had asked, so the detective "banged on the table in front of [him] to get [defendant's] attention to look at [him]." Detective LaBreche admitted that, when he banged on the table, he "raised [his] voice, trying to get [defendant's] attention because [defendant] wasn't focusing on what [Det. LaBreche] was asking him." Detective LaBreche denied making any threats or promises of leniency with respect to immigration proceedings, and he denied slapping defendant on the head or swearing at

him.  Detective LaBreche testified that he could not recall whether he or Det. Hammann had accused defendant of lying.  Detective LaBreche also stated that defendant's calm demeanor was the same in the second interrogation as in the first.

When Det. Hammann testified at trial regarding Det. LaBreche's behavior during the first interrogation, he stated that he

> "believe[d] at one time [he] might have been looking through [his] notes [and Det. LaBreche] might have, [he] wouldn't say raised his voice, [but Det. LaBreche] might have elevated his voice a little bit to get * * * [defendant's] attention * * *.  [Detective LaBreche] might have banged on the end of the table to get his attention."

Detective Hammann admitted that he had accused defendant of lying when defendant initially denied the allegations against him.  According to Det. Hammann, "it [was] possible" that Det. LaBreche had used profanity when speaking to defendant but Det. Hammann denied that Det. LaBreche had slapped defendant on the head.  Detective Hammann also denied making any deportation-related threats during the first interrogation.

When defendant took the stand during the trial, he testified that he was thirty-eight years old and that he came to the United States from The Gambia in West Africa in 2005 on a student visa to pursue studies in business administration and engineering management.  The defendant had attended a three-year technical college for electrical engineering in West Africa, and he had left his wife and young daughter there to pursue his studies abroad.  With respect to his arrest, defendant testified that he had initially assumed that the detectives were immigration officials because his student visa had expired and he was waiting to hear about the application for permanent residency that he had filed prior to the expiration of his student visa.  The defendant also testified that, during his arrest, he was kicked and pushed on his way to the police car and

that Det. Hammann had said "'[h]ow about f[']ing deporting you to Gambia?' and '[y]ou're f[']ing going to get killed.'"

With respect to the charges filed against him, defendant testified that he had never had any sexual contact with the complainant. He testified that, during the first interrogation, he was told that he was lying when he denied the complainant's allegations against him. He asserted that he was slapped on the head twice, once after he commented that the complainant was lying and once after he agreed to take a lie-detector test. He further testified that the detectives had threatened to call immigration officials, and that he would be deported and killed, and that they had also promised not to call the immigration officials if he admitted to molesting the complainant. The defendant also testified that he had falsely confessed to the sexual encounters with the complainant because he was scared of being deported and he wanted to seem cooperative. Because he had been assaulted and threatened by the detectives, he thought that anything he told them would be deemed "involuntary" and "void" by the court once the court was made aware of the assault and threats. The defendant asserted that he had taken cues from what the detectives had said when they accused him of rape and had used these cues to provide the false details in his confession. The defendant further testified that, during the second interrogation, he was feeling both nervous and relieved because he had decided to tell the court what had happened during the first interrogation.[4] The defendant acknowledged that he had not invoked any of the rights that he read and waived on the rights forms.

On May 13, 2010, after an eight-day jury trial, the jury returned guilty verdicts on two of the eight counts of first-degree child molestation that had been charged in the indictment. The defendant filed a motion for a new trial, which the trial justice denied. The trial justice

---

[4] The DVD of the second interrogation had been played in open court earlier in the trial, during Det. LaBreche's testimony.

subsequently sentenced defendant to thirty years' incarceration with twenty years to serve and ten years suspended, with probation.

In defendant's first appeal from his conviction, he argued that the trial justice had made three errors: (1) denying the motion to suppress the statements defendant had made to the police during his post-arrest interrogation, (2) not allowing defendant to inquire into a false accusation by the complainant against her mother regarding physical abuse, and (3) denying defendant's motion for new trial. In Bojang I, this Court affirmed the trial justice's evidentiary ruling and his denial of the motion for a new trial; but, as previously stated, we remanded the case to the Superior Court for additional factfinding and credibility determinations regarding the first interrogation and the voluntariness of defendant's confession.

On remand, the trial justice held a hearing in which he rendered additional findings and conclusions from the bench. He noted that the attorneys had not sought to enter any additional evidence and that they had agreed that he could make the additional findings of fact and credibility determinations based on his review of the transcripts and the notes that he had taken during the trial. He also noted that he had reviewed 671 transcript pages of suppression-hearing and trial testimony from Dets. Hammann and LaBreche as well as from defendant. After reviewing these testimonies, the trial justice found that defendant's version of events during the first interrogation was "at odds" with the DVD of the second interrogation. The trial justice also noted that defendant became "more and more relaxed and more and more engaged as the interview progresse[d]." The trial justice found that defendant's allegations of "assaults, threats, and fear" were not credible because defendant was "somewhat inconsistent." The trial justice further found that Det. Hammann, notwithstanding his resistance during the suppression-hearing testimony to defense counsel's questions, had unequivocally denied that Det. LaBreche had

- 8 -

struck defendant. The trial justice concluded that Det. LaBreche had not assaulted defendant, that the detective's raised voice and banging on the table had not affected the voluntariness of defendant's statement, and that defendant's confession was "voluntary and not the result of assault, threats, or coercion." The trial justice entered an order denying defendant's motion to suppress his confession, from which defendant timely appealed. Additional facts will be provided as we discuss the issue raised on appeal.

## II

## Standard of Review

"Both the Rhode Island and the United States Constitutions bar the use of a defendant's involuntary statements in a criminal trial." State v. Bido, 941 A.2d 822, 835 (R.I. 2008). "When deciding a motion to suppress, a trial justice can admit a confession or a statement against a defendant only if the state can first prove by clear and convincing evidence that the defendant knowingly, intelligently, and voluntarily waived his [or her] constitutional rights expressed in Miranda v. Arizona." State v. Mlyniec, 15 A.3d 983, 994 (R.I. 2011) (quoting Bido, 941 A.2d at 835). "In reviewing a trial justice's decision on a motion to suppress a statement that is alleged to be involuntary, this Court employs a two-step analysis." Id. "The first step is to review the trial justice's findings regarding the historical facts relevant to the voluntariness of the challenged confession." Id. (quoting State v. Perez, 882 A.2d 574, 588 (R.I. 2005)). "This Court will not overturn a trial justice's findings of historical fact relevant to the voluntariness of a confession unless such findings are clearly erroneous." Bido, 941 A.2d at 835 (quoting State v. Humphrey, 715 A.2d 1265, 1273 (R.I. 1998)). "The second step of the analysis, assuming we accept the trial justice's findings of historical fact, requires this Court to apply those historical facts and review de novo the trial justice's determination of the voluntariness of the statement."

Mlyniec, 15 A.3d at 994 (quoting Bido, 941 A.2d at 836). "Before we will reverse a trial court's ruling on a motion to suppress, our independent review of the conclusions of the trial court that are drawn from the historical facts must establish that the defendant's constitutional rights were denied." Id. (quoting Perez, 882 A.2d at 588).

### III

### Discussion

The defendant argues that the trial justice erred by admitting his confession into evidence because his confession was coerced in violation of his due process rights pursuant to the Fifth and Fourteenth Amendments to the United States Constitution, and article 1, section 10 of the Rhode Island Constitution. The defendant contends that the trial justice's credibility determinations were clearly erroneous because Det. Hammann was not a credible witness and defendant's testimony regarding the first interrogation should not have been discredited. The defendant also contends that the trial justice "overlooked and misconceived critical evidence" that the detectives had threatened and assaulted defendant. The defendant argues that his confession was involuntary because, "[w]hen viewing the 'totality of the circumstances,' it is apparent that [his] will was overborne by a combination of actual violence, threats of violence, deportation, and harsh punishment if he were not to confess." The defendant asserts that he is entitled to a new trial because, without evidence of physical trauma or eyewitnesses to the molestation, the only other evidence of guilt in the trial court's record was the complainant's testimony; thus, the admission of his confession was not a harmless error.

We begin our analysis with a careful review of the record to determine whether the trial justice's findings of fact and determinations of credibility are clearly erroneous. "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the basis

- 10 -

of the entire evidence is left with the definite and firm conviction that a mistake has been committed." Bido, 941 A.2d at 835-36 (quoting Perez, 882 A.2d at 588). The trial justice noted his concern with Det. Hammann's apparent resistance to answering questions throughout the record, commenting on several occasions about Det. Hammann's evasive demeanor and testimony during the suppression hearing. During the hearing on remand—and after reviewing the voluminous transcripts in this case—the trial justice noted that, during the suppression hearing, Det. Hammann "resist[ed] answering yes or no to certain questions * * * a lot." The trial justice also noted on remand that there were two redirect and two re-cross examinations during the suppression hearing, and that "[e]ach time there was a cross, [Det.] Hammann would become more disengaged * * *." During the suppression hearing itself, the trial justice acknowledged an "exceptional cross-examination" despite Det. Hammann "resisting on every question," and he assured defense counsel that he was absorbing "the dynamics of what [wa]s going on." The trial justice also made a comment in the midst of trial—outside of the presence of the jury—regarding Det. Hammann's testimony during the suppression hearing. After defendant had moved for a mistrial upon hearing that Det. Hammann would not be available to testify during the trial, the trial justice stated:

> "Before I hear from the [s]tate, let's make the record clear this morning on what the [c]ourt recalls, notwithstanding what the transcript indicates from the suppression hearing. The [c]ourt remembers, without extensively reviewing my own notes, it took [Det.] Hammann, especially in day number two of the suppression hearing, it took him several seconds, at least, to acknowledge what was possible. And, the [c]ourt remembers him thinking on the stand, and there was clearly a dynamic that was related to that, between the pause, [Det.] Hammann sometimes would look straight ahead, he would sometimes look up * * *. At one point the pauses became so pronounced, the record would show that [Det.] Hammann was actually excused from the courtroom, where

we could speak about what exactly was going on, notwithstanding what the transcript would show in this particular case."[5]

After wading through all the testimony regarding the interrogations and his own notes, and despite all of his expressions of reservations regarding Det. Hammann's demeanor and testimony, the trial justice concluded on remand that defendant had not been assaulted because Det. Hammann had consistently denied that Det. LaBreche had ever struck defendant. The trial justice also concluded that Det. Hammann's resistance to some of defense counsel's questions had not "undermine[d] [his] credibility regarding denials as to specific assaults and threats."

The trial justice also found that, when defendant testified at trial, he was "confrontational, * * * not shy or reserved * * *," and that his testimony regarding the first interrogation was "at odds" with his demeanor reflected in the second interrogation, such that "defendant's allegations with regard to assaults, threats and fear * * * [were] not credible because he's somewhat inconsistent * * *." In addition, the trial justice found that Det. LaBreche's raised voice and banging on the table "did not affect" the voluntariness of defendant's statements made during the second interrogation.

After carefully scrutinizing the record, it is our opinion that the trial justice's findings of fact regarding the voluntariness of defendant's confession were not clearly erroneous. On remand, the trial justice had to consider divergent accounts of the events that had transpired during the first interrogation in order to render factual findings and credibility determinations. The trial justice clearly parsed through the record as well as his own recorded observations from the hearing and trial to conclude that (1) despite Det. Hammann's hesitant behavior on the witness stand, he had consistently denied any physical assault on defendant and (2) defendant's

---

[5] The trial justice reserved his ruling on defendant's motion for a mistrial, and then Det. Hammann did testify the following week, which rendered defendant's motion moot.

account of the events in the first interrogation room was not credible. Clearly the trial justice was troubled, as were we, by Det. Hammann's evasive responses at the suppression hearing. The trial justice's initial failure to make adequate factual findings and credibility assessments left us unable—during defendant's first appeal—to review the factual predicates of his finding that defendant's statement had been freely and voluntarily given. On remand, however, the trial justice has supplied the insight that cannot be derived from reading a cold transcript, but rather is only possible through the firsthand observation of a witness's demeanor during the course of a trial. With respect to Det. Hammann's testimony, the trial justice observed a difference between how this witness responded to questions on direct and redirect examination and how he responded on cross- and recross-examination. The trial justice characterized the cross-examination as "above vigorous" and "exceptional," noting that "the detective began to fence with the cross-examiner" and "resist[ed] answering yes or no to certain questions." He ultimately concluded that this resistance did not "undermine [Det.] Hammann's credibility regarding denials as to specific assaults and threats." This conclusion, together with his finding that "defendant's testimony was not credible in this regard," are just the sort of evidentiary determinations for which we afford a trial justice abundant discretion. We rely on a trial justice's assessment of the credibility of the witnesses because, as we have often acknowledged, a trial justice is in the best position to assess the credibility of the witnesses. See Bido, 941 A.2d at 836. After reviewing the recorded portion of defendant's confession and considering Det. LaBreche's denial that defendant was physically assaulted, we are not "left with the definite and firm conviction that a mistake has been committed." Id. at 835-36 (quoting Perez, 882 A.2d at 588).[6]

---

[6] We note, however, that the remand would undoubtedly have not been necessary if defendant's

- 13 -

Since we have accepted the trial justice's findings of historical fact, we must now apply these facts and review de novo whether defendant's confession was voluntary. See Mlyniec, 15 A.3d at 994. "A defendant's statement is voluntary when it is the product of his free and rational choice." Bido, 941 A.2d at 836 (quoting Humphrey, 715 A.2d at 1274). "A statement is involuntary if it is extracted from the defendant by coercion or improper inducement, including threats, violence, or any undue influence that overcomes the free will of the defendant." Id. (quoting Humphrey, 715 A.2d at 1274). "In deciding whether a statement is voluntary, this Court considers 'the totality of the circumstances surrounding the challenged statement.'" Id. (quoting State v. Ramsey, 844 A.2d 715, 720 (R.I. 2004)). "The factors this Court may consider are the background, experience and conduct of the accused, as well as the level of a suspect's educational attainments." Id. (quoting Ramsey, 844 A.2d at 720).

After carefully reviewing the record, including the taped interrogation, we agree with the trial justice that defendant's confession was voluntary. The defendant testified that he had been in the United States since 2005, had studied electrical engineering at a college in West Africa and that he had traveled to the United States to pursue studies in engineering management. The defendant read and signed a form describing his Miranda rights on two occasions in a one-hour period. Based on the evidence admitted during the suppression hearing and at trial, the first interrogation was twenty to thirty minutes in duration, and the total interrogation time was less than ninety minutes in duration. We accept the trial justice's findings that defendant was not assaulted during the first interrogation and that defendant's statement was not the result of threats or coercion. See Ramsey, 844 A.2d at 718, 720 (holding that a defendant's confession was voluntarily made when there was no evidence that the defendant was intimidated by the

entire interrogation had been recorded.

- 14 -

detectives, who had admitted to yelling at the defendant during the interrogation and calling him a "f'ing liar").

In addition, the record is replete with references to the defendant's demeanor throughout his arrest and interrogations as "calm." For example, Det. Hammann referred to the defendant's calm demeanor several times during his testimony at the suppression hearing and at trial. Detective LaBreche described the defendant as "calm" on at least three occasions during his testimony at trial, and the trial justice noted that the defendant was relaxed during the second interrogation. As this Court has previously observed, a defendant's "calm, detached" voice during a confession can be an indication that the confession was not the product of impermissibly coercive tactics. Humphrey, 715 A.2d at 1273, 1274. After considering the totality of the circumstances, it is our opinion that the defendant's confession was voluntary and was not the product of coercion or impermissible conduct on the part of the interrogating detectives.

## IV

## Conclusion

For the reasons stated in this opinion, we affirm the trial justice's decision to deny the defendant's motion to suppress, thereby affirming the defendant's conviction. The record of this case shall be returned to the Superior Court.

**Justice Flaherty with whom Justice Robinson joins, concurring.** I concur with the opinion of the Court in this case and observe that the trial justice followed this Court's remand in State v. Bojang, 83 A.3d 526 (R.I. 2014) (Bojang I). However, and at the risk of sounding repetitive, I take this opportunity to express my opinion that this case remains a textbook

example of why custodial interrogations, whenever possible, should be video recorded in their entirety. Had that been done here, I am confident that this case would not have precipitated two appeals to this Court.

It is significant that the Rhode Island Police Accreditation Commission has recommended that police departments require that their officers videotape interviews with individuals suspected of committing capital offenses.[1] And the Department of Justice now presumes that its law enforcement agents will electronically record custodial interrogations.[2] When this Court issued its opinion in Bojang I, eighteen jurisdictions in this country either required recorded confessions by constitutional interpretations, statute, court rule, or mandated jury instructions on the scrutiny to be applied to unrecorded confessions.[3] Since then, three more jurisdictions have, in one way or another, restricted or discouraged the use of unrecorded confessions.[4] We should do so as well.

---

[1] See Rhode Island Police Accreditation Commission, RIPAC, Accreditation Standards Manual, Ch. 8, § 8.10 at 44-46 (May 2013), available at http://ripolicechiefs.org/wp-content/uploads/2015/
11/RIPAC_Accreditation_Standards_Manual_First_Edition_May_2013.pdf (last visited April 13, 2016).

[2] See Press Release, Department of Justice, Attorney General Holder Announces Significant Policy Shift Concerning Electronic Recording of Statements (May 22, 2014), available at http://www.justice.gov/opa/pr/attorney-general-holder-announces-significant-policy-shift-concerning-electronic-recording (last visited April 13, 2016).

[3] State v. Bojang, 83 A.3d 526, 545 n.7 (R.I. 2014) (Flaherty, J., dissenting).

[4] Cal. Penal Code § 859.5(a) (West Supp. 2016) ("Except as otherwise provided in this section, a custodial interrogation of a minor, who is in a fixed place of detention, and suspected of committing murder * * * shall be electronically recorded in its entirety."); Utah R. Evid. 616(b) ("[E]vidence of a statement made by the defendant during a custodial interrogation in a place of detention shall not be admitted against the defendant in a felony criminal prosecution unless an electronic recording of the statement was made and is available at trial."); Vt. Stat. Ann. tit. 13, § 5585(b)(1) (2015) (Providing that a custodial interrogation that occurs in a place of detention concerning the investigation of a homicide or sexual assault shall be electronically recorded in its entirety.)



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**       State v. Mustapha Bojang.

**CASE NO:**       No. 2014-269-C.A.
                          (P1/09-1119A)

**COURT:**       Supreme Court

**DATE OPINION FILED:**  April 26, 2016

**JUSTICES:**       Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**       Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**   Providence County Superior Court

**JUDGE FROM LOWER COURT**:

              Associate Justice William E. Carnes, Jr.

**ATTORNEYS ON APPEAL:**

              For State:  Lauren S. Zurier
                          Department of Attorney General

              For Defendant:  Kara J. Maguire
                          Office of the Public Defender