STATE

v.

**Victor PEREZ.**

No. 2002–241–C.A.

Supreme Court of Rhode Island.

Aug. 26, 2005.

---

Christopher R. Bush, for Plaintiff.

Janice M. Weisfeld, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

ROBINSON, Justice.

A jury found defendant Victor Perez guilty of first-degree murder for the killing of his mother, Rosa Perez.[1] He was sentenced to serve a term of life imprisonment. He has appealed to this Court, contending that the trial justice committed reversible error: (1) in permitting the state's psychiatric expert to be present in the courtroom and to observe the defendant testify before he provided his expert opinion about the defendant; (2) in allowing the same expert to render a particular medical opinion in purported violation of the discovery provisions of the Superior Court Rules of Criminal Procedure; (3) in denying the defendant's motion to suppress statements that he made to police at the time of his arrest, which motion contended that the state had violated his *Miranda* rights; and, (4) in denying the defendant's motion to dismiss based upon the state's alleged violation of his right to a speedy trial. We discern no reversible error, and we therefore affirm the judgment of conviction.

### Facts and Travel[2]

In the late summer of 1998, defendant lived with his mother and his mother's friend, Lolo,[3] in her eighth-floor apartment at Dexter Manor on Broad Street, Providence. During that period, defendant used marijuana and cocaine on a daily basis, and he occasionally used LSD and alcohol as well.

Victor testified that, on the morning of August 13, 1998, he smoked a combination of marijuana and "crack" before he dressed and went out for the day. While he was out, he smoked more marijuana and felt as if he were "tripping" on "acid," even though he had not used any LSD for two days. At some point later in the day, Victor returned to his mother's apartment. While his mother was in another room, Victor smoked marijuana in the living room with Lolo and a neighbor as they watched a Spanish movie on a videocassette. Before the movie ended, the neighbor left the apartment, and Lolo disconnected the VCR. Lolo then took the VCR into the bedroom that he and Rosa shared. Rosa followed Lolo into the bedroom, and shortly thereafter the couple began to quarrel.

According to Victor's testimony, he became angry when he heard Lolo screaming at his mother. He said that he feared for her safety because he knew that Lolo kept a knife in the bedroom. In reaction to the noise of the quarrel coming from the bedroom, Victor took a black-handled knife from the kitchen counter, concealed it in his waistband, and went into the bedroom to tell Lolo to leave his mother alone. Lolo told defendant to mind his own business. Rosa left the bedroom and went into the kitchen. Victor followed his mother out of the bedroom and went into the living room to sit on the couch. Lolo continued yelling at Rosa from the bed-

1. For the sake of clarity, we shall frequently refer to the defendant and his mother by their first names in this opinion.

2. The facts in this case are largely undisputed. (Indeed, many of the facts that are material to this appeal are taken directly from defendant's own trial testimony.) We summarize the most pertinent background facts in this section of the opinion; and, as we proceed to discuss defendant's appellate contentions in the analysis section, additional facts will be provided where necessary.

3. Lolo's full name does not appear in the record. It is not entirely clear from the record whether Lolo was the boyfriend or the husband of Rosa Perez, but that marital status issue is irrelevant to the legal issues raised on this appeal.

room, and he threatened to leave her if she chose Victor over him.

Victor then went back into the bedroom and once again told Lolo to leave his mother alone. At this point, Lolo was getting dressed, and he told Victor that he was leaving. Victor told Lolo that he and his mother did not "need" him and that he was free to "leave any time he wanted." At some point, Rosa noticed that a knife was missing from the kitchen counter, and demanded that Victor give it to her. Victor told his mother that he did not have a knife, and he then went into the living room and again sat on the couch.

While Victor was sitting on the couch, Lolo emerged from the bedroom and went into the kitchen to give Rosa some money and to hug her before he left the apartment. As Lolo was reaching out to hug Rosa, Victor (according to his testimony) formed the belief that Lolo was trying to inflict physical harm on his mother. He leaped from the couch and ran towards Lolo while reaching for the knife in his waistband. Before defendant could reach him, Lolo left the apartment and closed the door. Meanwhile, the blade of the knife that defendant had been pulling out from his waistband broke away from the handle and fell to the floor. Rosa spotted the blade and tried to seize it before defendant could get to it.

Victor testified that, when he saw his mother reach for the blade, he thought she was trying to attack him and he lost command of himself. A struggle ensued between mother and son for control of the blade. When Rosa succeeded in reaching the blade before her son did, he immediately grabbed a wooden-handled knife from a nearby knife rack and began slashing at his mother.

Victor further testified that, when he turned around with the second knife in his hand, he came to believe that his mother was "the devil." He further testified that, because he believed that "the devil" was trying to kill him, he felt that he had to protect himself by "hitting him with the knife until I finally had a chance to get away * * *."

Victor's testimony continued with his statement that "the devil" fought back by cutting his hand and wounding his leg. He also said that when "the devil" dropped the knife blade and then tried to retrieve it, he threw his own knife to the ground and began to fight with "the devil" until "the devil slowed down." He said that "the devil" was still standing when he ran out of the apartment.

Rosa suffered two stab wounds and forty incised wounds. The medical examiner testified that "a stab wound is typically deeper than it is wide," whereas an incised wound, which "is more like a cut," is that it "typically is longer than it is deeper." He further testified that the cause of death was "bleeding due to injuries to the liver." The injuries to the liver had been caused by a five to six inch abdominal stab wound.

Gregory Vasquez, a neighbor and friend of Rosa's, lived on the ninth floor of the apartment building. He testified that on August 13, 1998, he went down to the eighth floor to check on his friend, Alba Martinez, at some point between 11 p.m. and midnight. While he was in the common area of the eighth floor, he observed Victor[4] running in the opposite direction and away from Rosa's apartment. He then saw Victor run back towards his mother's apartment, enter it, and then un-

---

**4.** Mr. Vasquez recognized defendant because he had previously been introduced to him by Rosa.

successfully try to close the door. At that point, Victor rushed back out of his mother's apartment and ran past Gregory Vasquez. Mr. Vasquez said that Victor was "running like he was crazy, up and down, everywhere." Mr. Vasquez further described Victor's demeanor as follows: "He was all confused. He didn't know where he wanted to go." As Victor rushed past him, Mr. Vasquez noticed that he was wearing only jeans and blood-stained socks and that he was carrying something in his hand. He also observed bloody footprints and blood-stained twenty-dollar bills in the hallway.

Gregory Vasquez immediately went to Rosa's apartment to investigate. At the entrance to the apartment, he saw Rosa lying in a pool of blood, and he heard her asking for a pillow. Mr. Vasquez ran to the apartment of Alba Martinez and banged loudly on her door. When she opened the door, he told her to call for emergency assistance.

Alba Martinez testified that at approximately 11:30 that night, she woke up to the sound of banging on her door. When she answered the door, she was confronted by Gregory Vasquez, who told her that Rosa had been killed. Ms. Martinez immediately put her clothes on, grabbed her cordless telephone and dialed "911." She then rushed to the scene of the crime. At the apartment, Ms. Martinez saw Rosa lying on the kitchen floor. She observed that Rosa was moving her arms and calling out for help. Ms. Martinez testified as follows about what Rosa said to her at that moment: "I asked her, 'Rosa, who did this to you?' And she answered me, 'My son.'"

Meanwhile, Officer Michael Pinto of the Providence police arrived. Officer Pinto testified that he observed a female lying on the floor of the apartment in a very large pool of blood. He said that her eyes were open and that she was struggling to breathe. He asked her what had happened but, although she responded to his question, he could not comprehend what she was saying because he did not understand Spanish. He immediately radioed for rescue personnel, and he then secured the scene.

Officer Pinto described the apartment as being in a shambles, with blood everywhere. He said that he observed what appeared to be the blade of a knife on the kitchen floor as well as bloody footprints in the hallway going in both directions. Officer Pinto testified that two persons, whom he later determined to be Gregory Vasquez and Alba Martinez, approached him in a very excited state. Mr. Vasquez provided Officer Pinto with Rosa's name; and, despite the language barrier, he managed to inform Officer Pinto that he had heard Rosa and her son arguing loudly. In addition, Officer Pinto obtained an approximate description of Victor from Mr. Vasquez and Ms. Martinez through a series of hand gestures. He then radioed for further police assistance.

Once additional police officers and rescue personnel arrived, Officer Pinto along with Sergeant Joseph Lennon and Officer Jose Deschamps of the Providence police attempted to locate the person who was responsible for the bloody footprints that were visible in the hallway. Officer Pinto testified that, even though there were "dozens upon dozens of bloody footprints throughout the building, up and down various stairwells and various floors of the building," the police officers succeeded in determining that the footprints ultimately led to the entrance of an apartment on the second floor.[5]

---

5. The discovery of two bloody twenty-dollar bills in the eighth-floor hallway and a bloody tee shirt in the stairwell assisted the officers in their efforts to follow the bloody footprints.

Luis Rivera resided in apartment 207 on the second floor. He testified at trial that on the night of August 13, 1998, at approximately 11:25 p.m., he heard knocking on his door while he was watching television. As soon as he opened the door, Mr. Rivera realized that it was Victor who had been knocking. He noticed that Victor's leg was bleeding, and he also thought that Victor was acting crazy.[6] Victor entered the apartment and asked Mr. Rivera for a glass of juice. As soon as Mr. Rivera gave him something to drink, Victor went into the bathroom to take a shower. He then changed into clothing that he took from Mr. Rivera's closet, and he concealed his own bloody clothing under a sofa or chair.

Mr. Rivera became suspicious when he looked out of his window and saw rescue personnel carrying a bloody body out on a stretcher. Victor told Mr. Rivera (according to the latter's testimony) that he "had a problem downtown." Mr. Rivera apparently was not satisfied with Victor's reply, because he then asked him whether he had killed his mother. At that point, defendant retrieved a knife from the kitchen, wrapped it in a towel, and sat down next to Mr. Rivera on the bed. Mr. Rivera heard knocking on the door of the apartment approximately forty-five minutes after defendant had entered his apartment. At that point, Victor went into the bathroom carrying the knife that he had taken from the kitchen.

When Mr. Rivera opened the door, he was confronted by police officers, who asked him whether Victor was with him in the apartment. At first, Mr. Rivera denied knowing anyone called Victor, and he told the police that there was no one by that name in the apartment.[7] The police officers then asked Mr. Rivera for permission to enter the apartment, which he granted.

Sergeant Lennon, Officer Deschamps, and other Providence police officers immediately began to search the apartment for the person whose description had been given to them. They found a man matching that description standing in the bathroom and brandishing a knife at "an attack point."[8] By this time, all of the police officers present had taken their guns from their holsters. Officer Deschamps ordered Victor several times, in both English and Spanish, to drop the knife and to come out of the bathroom. After "a couple of seconds," Victor complied and surrendered to the police.

Police officers immediately grabbed Victor and pushed him, onto a nearby bed, where they handcuffed his hands behind his back. While Victor was being restrained, Officer Deschamps recited the *Miranda* warnings[9] to him in both English and Spanish, and he did so in a loud voice.[10]

---

6. The expression "acting crazy" was used by defense counsel in a question that he put to Mr. Rivera. In answering the question, Mr. Rivera accepted that characterization of defendant's behavior:

"[DEFENSE COUNSEL:] Now you said in addition to appearing to be on drugs and being out of himself you pointed to your head; and, did you point to your head because you thought he was acting crazy?
"[MR. RIVERA:] Yes. I had never seen him like that."

7. Mr. Rivera testified that he was unaware that defendant was called "Victor." He said that he knew him by the name "Roberto."

8. Apparently, Victor was holding the knife at shoulder height, with the blade pointing towards the police officers.

9. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

10. Officer Deschamps testified that he read the *Miranda* warnings from a preprinted card. He did not have the card with him at trial, but he was able to recite the warnings

Officer Deschamps then asked Victor "where his mother lived and when was the last time he saw her, something to that effect." [11] Victor told Officer Deschamps that he "didn't do anything to [his mother]." Officer Deschamps then asked Victor about the injuries on his lower leg and hand, and Victor responded that he had received the injuries in "a fight in the downtown area."

Officer Deschamps testified that he received instructions to take Victor to the police station and that, while he was looking in a closet in Mr. Rivera's apartment to find shoes for Victor to wear, he discovered a pile of bloody clothing. Victor was then brought to the police station. The police subsequently recovered several other bloody items, including three knives. One of the knives bore Victor's fingerprints.

At trial, Victor did not deny that he killed his mother. He contended, however, that, when he killed her, he was suffering from diminished capacity. Doctor James Greer, a psychiatrist, testified in support of Victor's diminished-capacity defense. [12] Doctor Greer opined that, when Victor killed his mother, he was suffering from diminished capacity—due to his level of intoxication at the time of the killing, coupled with his history of substance abuse.

In rebuttal, the state presented its own psychiatric expert, Dr. Martin Kelly, who had been retained for the sole purpose of rebutting Victor's claim of diminished capacity. [13] Doctor Kelly, who was present in the courtroom during Victor's testimony, testified that, before the trial began, he had reviewed all of the relevant reports and records relating to Victor. His opinion, in rebuttal of the defense's diminished-capacity contention, was that he "could find no mental condition, psychological state, or state of intoxication" to support a conclusion that Victor's capacity was diminished when he killed his mother. Doctor Kelly then testified, over objection, that he had diagnosed Victor as suffering from "antisocial personality disorder." He further testified that the latter term applies to "people who chronically break the law" and "who have repeated patterns of conduct that likely get them institutionalized or incarcerated."

At the conclusion of the trial, the jury found Victor guilty of first-degree murder. This appeal followed.

## Analysis

### I. The Presence of the Expert in the Courtroom

■ In the course of pretrial proceedings, the state had sought permission to have its anticipated expert psychiatric witness, Dr. Kelly, examine Victor. The court declined to grant unequivocal per-

from memory. The last two sentences were: "These are your Constitutional rights. Do you understand them?"

11. Officer Deschamps testified that his conversation with Victor was in English and that Victor "understood more English than he did Spanish." He further testified that Victor acted in an "extremely angry" and "cocky" manner and that he repeatedly had to tell Victor to calm down.

12. Doctor James Greer testified that he was on the clinical faculty at Brown University Medical School and that he was the Clinical Director of the Child Family Unit at Providence Center Community Mental Health Center. He also testified that he served as a psychiatric consultant to certain agencies and institutions, including the Adult Correctional Institutions.

13. Doctor Martin Kelly testified that he was an associate professor of psychiatry at Harvard Medical School and that, in addition, he was on the staff of the Dana Farber Cancer Institute and the Brigham and Women's Hospital.

mission for such an examination; instead, it imposed certain restrictions on the scope of Dr. Kelly's examination of Victor. Most notably, the order issued by the Superior Court specifically barred Dr. Kelly from inquiring about the actual factual basis of the death of Rosa Perez.

With these restrictions in mind, Dr. Kelly examined Victor in the presence of defense counsel on March 21, 2001. Thereafter, he composed a psychiatric evaluation based upon his interview with Victor, as well as upon various medical and police reports that the state made available to him for his review.

During the actual trial, at the close of the state's case-in-chief, the trial justice heard arguments on Victor's motion to sequester Dr. Kelly, whom the state intended to present in rebuttal of the defendant's diminished-capacity defense. Defense counsel argued that Dr. Kelly should not be allowed to be present in the courtroom during Victor's testimony because when he subsequently offered expert testimony, the jury's knowledge of his presence would (according to defense counsel) constitute a form of impermissible bolstering. The state objected to the motion to sequester Dr. Kelly, arguing that Dr. Kelly's presence in the courtroom during Victor's testimony was essential to its case; the state emphasized that Dr. Kelly had previously been precluded by court order from inquiring about the murder during his examination of defendant. After hearing the arguments of counsel, the trial justice denied defendant's motion to sequester.

Victor asserts that the trial justice erred in denying his motion to sequester Dr. Kelly. He continues to argue that Dr. Kelly's expert testimony was, in effect, a form of impermissible vouching or bolstering.

■■■ A trial justice is vested with the inherent authority to sequester witnesses during trial testimony for the purpose of preventing that witness from shaping his or her testimony to conform to that of other witnesses. *State v. Mathias,* 423 A.2d 484, 486 (R.I.1980). The decision by a trial justice to exclude a witness from the courtroom is discretionary and will not be disturbed absent a clear abuse of that discretion. *Id.; see also State v. McDowell,* 685 A.2d 252, 258 (R.I.1996); *State v. Raposa,* 100 R.I. 516, 517, 217 A.2d 469, 470 (1966); *State v. Cyrulik,* 100 R.I. 282, 284, 214 A.2d 382, 383–84 (1965). It should be noted, however, that a trial justice's discretionary power to exclude witnesses is not unlimited; that power is restricted by the explicit provisions of Rule 615 of the Rhode Island Rules of Evidence. Pursuant to Rule 615(3), a witness may not be excluded from the courtroom if (*inter alia*) that person's presence is shown by a party to be "essential to the presentation" of that party's cause.[14]

In denying Victor's motion to sequester, the trial justice observed that it is not unusual for an expert who is expected to give an opinion later in the trial to remain in the courtroom during the trial testimony. The trial justice also noted that Dr. Kelly's opportunity to examine defendant before trial had been restricted at the

14. Rule 615 of the Rhode Island Rules of Evidence provides:

"At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize the exclusion of (1) a party who is a natural person, or (2) an officer or agent of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his or her cause."

request of defense counsel and that, as a result, he was "satisfied that the State's request to have the doctor present during defendant's testimony is well-founded and, indeed, comports with the exception of Rule 615(3)." We agree with this determination.

In the trial of this case, defendant raised the defense of diminished capacity in an attempt to show that, at the time that he killed his mother, he lacked the necessary specific intent to commit murder. Bearing in mind that the prosecution had the burden of proving each and every element of the crime of murder beyond a reasonable doubt, it was necessary for the prosecution to rebut Victor's defense by proving that he was not suffering from diminished capacity. *See State v. Pacheco,* 481 A.2d 1009, 1028 (R.I.1984).

In light of the foregoing considerations, it is our opinion that the trial justice correctly found that Dr. Kelly's expert testimony was essential to the prosecution's presentation of its rebuttal; and it is further our opinion that the trial justice correctly held that, in view of that preliminary finding, Rule 615(3) would not permit the exclusion of Dr. Kelly from the courtroom during Victor's testimony.[15]

## II. Rule 16 and the Prosecution's Expert Medical Opinion

■ The defendant next contends that the trial justice committed reversible error

by not limiting the scope of Dr. Kelly's expert testimony. He specifically argues that it was error to allow Dr. Kelly to testify that he suffered from "antisocial personality disorder" because the prosecution had failed to inform the defense of this diagnosis in accordance with Rule 16 of the Superior Court Rules of Criminal Procedure (which Rule is entitled, "Discovery and inspection"). The prosecution asserts that, in spite of the fact that it did not include the "antisocial personality disorder" diagnosis in its discovery responses, the trial justice's decision to admit the testimony concerning that diagnosis did not amount to a clear abuse of discretion.[16]

■■ When a trial justice rules on an issue of noncompliance with Rule 16, this Court will sustain the trial justice's ruling absent a clear abuse of discretion. *State v. Coelho,* 454 A.2d 241, 244–45 (R.I.1982) ("Without question, the trial justice is in the best position to determine whether any harm has resulted from noncompliance with discovery motions and whether the harm can be mitigated; therefore, his ruling should not be overturned absent a clear abuse of discretion."); *see also State v. Garcia,* 643 A.2d 180, 186 (R.I.1994) ("[T]he determination of whether any harm has resulted from noncompliance with discovery motions and whether the harm can be mitigated is within the sound discretion of the trial justice."); *see generally State v. Pona,* 810 A.2d 245, 248 (R.I. 2002); *State v. Gomes,* 690 A.2d 310, 319

15. In view of the fact that Dr. Kelly's presence was "essential to the presentation" of the prosecution's case (Rule 615(3)), we need not reach defendant's argument that Dr. Kelly's presence constituted a form of impermissible bolstering.

16. Rule 16(i) of the Superior Court Rules of Criminal Procedure provides for the imposition of sanctions for failure to comply with the provisions of Rule 16:

"If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, it may order such party to provide the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material which or testimony of a witness whose identity or statement were not disclosed, or it may enter such other order as it deems appropriate."

(R.I.1997). It should be noted, however, that the discretion afforded to the trial justice under Rule 16 "is limited, bounded by law, and reviewable." *Coelho,* 454 A.2d at 245.

When exercising his or her discretion in the face of noncompliance with discovery motions under Rule 16, the "trial justice must consider what is 'right and equitable under all of the circumstances and the law.'" *Coelho,* 454 A.2d at 245 (quoting *State v. Allan,* 433 A.2d 222, 225 (R.I.1981)). The appropriateness of a sanction under Rule 16 can be determined only after the trial justice has considered (as must this Court on review) the following factors: "(1) the reason for nondisclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors." *Coelho,* 454 A.2d at 245; *see also Pona,* 810 A.2d at 248; *State v. Oliveira,* 774 A.2d 893, 905 (R.I.2001). If, however, the nondisclosure is determined to have been a deliberate act of misconduct, a new trial should be granted "without inquiry into the degree of harm produced by the misconduct." *Garcia,* 643 A.2d at 187.

As we have already noted, Dr. Kelly was retained as an expert witness by the prosecution in order to rebut Victor's diminished-capacity defense. Because Dr. Kelly had been precluded by court order from asking Victor about the murder during the examination that he conducted before trial, he was permitted to remain in the courtroom while Victor testified so that he could further develop his rebuttal testimony. After Victor had testified, the state filed in open court a supplemental response to defendant's request for discovery. The purpose of that supplemental response was to update the state's disclosures as to what it expected Dr. Kelly's testimony would be. The supplemental response was filed on the morning that Dr. Kelly was due to testify.

A few hours later, during a sidebar conference, defense counsel learned for the first time that Dr. Kelly intended to testify that he had diagnosed Victor as having "antisocial personality disorder." [17] Immediately before the sidebar conference, Dr. Kelly testified that he believed that Victor suffered from a psychiatric illness. When the prosecutor asked Dr. Kelly to describe that illness, defense counsel immediately objected and requested the sidebar conference. The trial justice granted the request after excusing Dr. Kelly and the jury for the day.

At the sidebar conference, the prosecutor informed the trial justice (and defense counsel) that Dr. Kelly intended to testify that he had diagnosed Victor as suffering from "antisocial personality disorder." Defense counsel restated his objection, asserting that he had not received notice of this proposed testimony and that the admission of such testimony would be grossly unfair. He also contended that the diagnosis constituted improper rebuttal because it had no relevance to the diminished-capacity defense. After hearing the arguments of the parties, the trial justice sustained the objection. The prosecution later requested that the trial justice reconsider his ruling. Accordingly, on the following morning, the trial justice conducted a voir dire examination of Dr. Kelly.

During the voir dire examination, Dr. Kelly testified that "antisocial personality disorder" is characterized by a "deeply

---

**17.** It is undisputed that the prosecution did not notify the defense in either its pretrial discovery materials or in its supplemental discovery materials that Dr. Kelly would testify that Victor suffered from "antisocial personality disorder."

ingrained pattern of behavior extending back to childhood, adolescence, which shows consistent antisocial conduct as manifested by behaviors against the rules of society, and organizations, structures that a person might be involved in." [18] He further testified that "antisocial personality disorder" is characterized by "a pervasive pattern of conduct that extends back to adolescence [and] childhood," but that the actual diagnosis cannot be made until a person reaches eighteen. Doctor Kelly testified that, when a person exhibits similar behaviors before reaching the age of eighteen, such behaviors are considered to be just a phase in that adolescent's development and are diagnosed as "conduct disorder" rather than as "antisocial personality disorder." [19]

After conducting the voir dire examination of Dr. Kelly, the trial justice concluded that the proposed testimony would be admissible.[20] In so ruling, the trial justice referred to exhibits that had previously been offered into evidence by defense counsel, and he stated:

"In the Providence Center discharge form Defendant's Exhibit K the primary diagnosis of Victor Perez November of 1997 is 'conduct disorder.' In the Surbo report page 8 there is a specific reference in the next to last paragraph of 'underlying antisocial trends to his personality.' Page 9, last paragraph it references the fact that 'he appears to be suffering a disturbed personality structure.' At page 10 the diagnostic impression includes Axis 1 conduct disorder, childhood-onset type. Axis 2, personality disorder (antisocial). In the Newport report, your Exhibit D, page 13, diagnostic impression Axis 1, conduct disorder, Axis 2, personality disorder, page 16, antisocial, Axis 2.

"So to suggest that there is nothing in the materials that would have put you on notice that there are indeed pointers to what this witness is speaking about, you're wrong."

The trial justice further stated:

"Let me say that I think that the State has an opportunity to ask an expert witness in rebuttal who disagrees with your expert to explain why he disagrees and what opinion he offers as to the nature of this disagreement when there is such. If this were a true blindside I might feel differently about it.

18. It is interesting to note that the record reveals that defendant's own expert witness, Dr. Greer, testified on direct that Victor "had a conduct disorder which is a disorder in childhood characterized by things like substance abuse, aggressive behavior, refusal to obey rules, disregard for the rights of others, theft, sometimes cruelty to animals, [and] so forth * * *."

19. In response to a question posed by the trial justice, Dr. Kelly compared "conduct disorder" with "antisocial personality disorder" as follows:

"First if I could address conduct disorder versus antisocial personality disorder. On the last day of the seventeenth year the proper diagnosis * * * is conduct disorder. On the 18th birthday the same behaviors the diagnosis becomes antisocial personality disorder. * * * [C]onduct disorder becomes antisocial personality disorder when a person becomes 18, if all behaviors are the same."

20. The trial justice ruled that the proposed testimony would be properly admissible for purposes of rebuttal. We have previously noted, as have other courts, that the purpose of rebuttal testimony is to explain, repel, counteract, or disprove the adverse party's evidence. *State v. Stewart*, 663 A.2d 912, 927 (R.I.1995). We are also mindful of the principle that a decision to permit rebuttal testimony lies within the discretion of the trial justice and will not be overturned absent an abuse of that discretion. *Id.* We perceive no abuse of discretion in the trial justice's ruling that the disputed testimony would be appropriate for purposes of rebuttal in this case.

The fact that the documents that I have referred to came from your [defense counsel's] file rather than the State, to me, helps you not at all. These are your documents, ones that you're intimately familiar with, and it would seem to me that this witness [Dr. Kelly] certainly ought to be able to testify that he disagrees with Dr. Greer, and he has a different conclusion, and why he has that different conclusion. And, it seems to me that there is sufficient evidence before me in the various exhibits you produced that should have put you on full notice that conduct disorder was something that very well would be part of this case."

Upon hearing the trial justice's ruling on the objection, defense counsel immediately requested that the trial justice grant a continuance upon the completion of Dr. Kelly's testimony so that he could prepare his response to that testimony. The trial justice granted the continuance until the following day, as requested. The next day, defense counsel began his cross-examination of Dr. Kelly without requesting a further continuance.

There is no evidence in the record indicating that the nondisclosure of Dr. Kelly's medical diagnosis was a deliberate act of misconduct by the prosecution. Accordingly, we will review the trial justice's decision to admit the testimony under the clear abuse of discretion standard, keeping in mind the factors outlined above.

The testimony of Dr. Kelly in the record reveals that, when a person who is diagnosed with "conduct disorder" reaches the age of eighteen and continues to display the same behaviors, the "conduct disorder" diagnosis is reclassified as "antisocial personality disorder." The defendant's own psychiatric expert, Dr. Greer, testified that Victor had suffered from "conduct disorder" as a child, and he explained the characteristics of that disorder to the jury. Other documentation introduced into evidence supported that diagnosis.

In view of the fact that the characteristics and behaviors associated with "antisocial personality disorder" are the same as those associated with "conduct disorder" and that those characteristics and behaviors had already been introduced during the trial in the form of testimony about "conduct disorder," it is clear that defense counsel was familiar with those particular characteristics and behaviors. Consequently, we conclude that defense counsel was in a position to cross-examine Dr. Kelly about "antisocial personality disorder" and that the extent of the prejudice, if any, to Victor's defense was minimal. Furthermore and significantly, the record reveals that the trial justice mitigated any alleged prejudice by granting defense counsel's request for a continuance.[21]

In light of the foregoing, we conclude that the trial justice did not abuse his discretion in allowing Dr. Kelly to testify as summarized above.

### III. The Motion to Suppress Defendant's Statements

#### A. The Defendant's Waiver of His *Miranda* Rights

The defendant also contends that the trial justice committed reversible error in denying the pretrial motion to suppress two statements that he made to the police just after he was taken into custody. The first of the contested statements by Victor related to his mother. After Officer Deschamps asked him about the last time that he had seen his mother, Victor replied that

---

**21.** As previously noted, after obtaining that continuance, defense counsel opted not to seek any further continuance when the trial resumed on the next day.

he had not done anything to her. Victor's second statement to the police involved his explanation about the cause of his obvious injuries. In that statement, Victor indicated that he had received his injuries during a fight in downtown Providence.[22]

Victor asserts that, because of the chaotic and confusing circumstances surrounding his arrest, the prosecution failed to prove both that he understood his *Miranda* rights and that he knowingly and voluntarily waived them when he gave those challenged statements.

Before a criminal defendant's custodial statements may be admitted into evidence, "the state must establish by clear and convincing evidence that the statement was voluntary and that the defendant knowingly and intelligently waived his *Miranda* rights." *Garcia*, 643 A.2d at 188; *see also State v. Espinosa*, 109 R.I. 221, 230, 283 A.2d 465, 469–70 (1971).

As we have stated, "[i]n reviewing a trial justice's decision on a motion to suppress a confession that is claimed to be involuntary, we perform a two-step analysis." *State v. Humphrey*, 715 A.2d 1265, 1273 (R.I.1998). The first step is to "review the trial justice's findings regarding the historical facts relevant to the voluntariness of the challenged confession." *Id.* The next step is to "apply those historical facts and review the trial justice's determination as to the voluntariness of the challenged confession [on a] *de novo* [basis]." *Id.; see also Ornelas v. United States*, 517 U.S. 690, 696–97, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *State v. Kryla*, 742 A.2d 1178, 1183 (R.I.1999). Before we will reverse a trial court's ruling on a motion to suppress, our independent review of the conclusions of the trial court that are drawn from the historical facts must establish that the defendant's constitutional rights were denied. *State v. Grayhurst*, 852 A.2d 491, 513 (R.I.2004).

We have previously stated that "[t]he findings of historical fact by the trial justice are given great weight and will not be set aside unless they are clearly wrong." *State v. Bailey*, 677 A.2d 407, 410 (R.I.1996); *see also State v. Werner*, 831 A.2d 183, 191 (R.I.2003); *Humphrey*, 715 A.2d at 1273; *State v. Pemental*, 434 A.2d 932, 935 (R.I.1981). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the basis of the entire evidence is left with the definite and firm conviction that a mistake has been committed." *State v. LaRosa*, 112 R.I. 571, 576, 313 A.2d 375, 377 (1974); *see also Humphrey*, 715 A.2d at 1273; *State v. Baton*, 488 A.2d 696, 701 (R.I.1985).

At the hearing on Victor's motion to suppress, Officer Deschamps testified that he recited the *Miranda* warnings to Victor while the other police officers in the apartment were attempting to subdue him. He further testified that, Victor "was extremely cocky, very belligerent towards police" and that, "at one point, [he] attempted to fight us * * *." After he informed Victor of his *Miranda* rights, Officer Deschamps asked him when had he last seen his mother and how he had received the injuries to his leg and hand. Officer Deschamps further testified at the suppression hearing that Victor told him that he "didn't do anything to [his mother]" and that "he had gotten into an argument, or fight, downtown, downtown area."

---

**22.** Although these statements might be considered exculpatory, such an observation does not influence our analysis. *See State v. Iovino*, 524 A.2d 556, 561 (R.I.1987) (recognizing that the application of the *Miranda* rule does not distinguish between statements that are exculpatory rather than inculpatory).

In denying the motion to suppress, the trial justice found that Victor was not disoriented at the time of his arrest and that:

"He certainly was hostile. He certainly was belligerent. Indeed, he was threatening officers with a knife. Guns were pointed at the defendant, certainly not to extract a confession but, more importantly, to extract a knife from his possession which he was menacing the officers with."

The trial justice additionally found that, even though Victor was injured when Officer Deschamps read his *Miranda* rights to him, his injuries could not have been very serious because of the level of resistance that Victor demonstrated during his arrest. The trial justice further found that, Victor's demeanor was cocky and that such a demeanor was indicative of his understanding of the circumstances that were occurring and of what Officer Deschamps had said to him about his rights under *Miranda.*

After carefully reviewing the record and bearing in mind the due deference that this Court gives to the trial justice's findings of historical fact, we cannot say that the trial justice's findings were clearly erroneous.

 Having determined that the trial justice's findings of historical fact were not clearly erroneous, we must next exercise our independent judgment to establish whether Victor was deprived of his constitutional rights. *Grayhurst,* 852 A.2d

at 513. The definitive test of the voluntariness of a statement is whether, after taking into consideration the totality of the circumstances, it was the product of the defendant's free will or was instead the result of coercion that overcame the defendant's free will at the time that it was made. *See State v. Amado,* 424 A.2d 1057, 1062 (R.I.1981); *see also State v. Girard,* 799 A.2d 238, 250 (R.I.2002); *State v. Torres,* 787 A.2d 1214, 1224 (R.I.2002).

 A valid waiver of *Miranda* rights cannot be presumed from the silence of the accused after the *Miranda* warnings have been issued, nor can it be presumed from the fact that the accused has actually made a confession or a statement. *Amado,* 424 A.2d at 1062; *see also State v. Burbine,* 451 A.2d 22, 35 (R.I.1982).

In denying the motion to suppress, the trial justice reviewed the totality of the factual circumstances, and he then ruled that defendant had been apprised of his constitutional rights and that he had made the challenged statements "voluntarily * * * with all the awareness of [the] rights that had been administered to him." [23] Our *de novo* review of the voluntariness issue in light of the trial justice's findings of historical fact leads us to the same conclusion as that reached by the trial justice: Victor Perez was apprised of his rights under *Miranda,* and he knowingly and voluntarily made the two above-referenced statements to the police after being so apprised.[24]

---

**23.** The trial justice summarized his conclusions in the following words: "[Officer] Deschamps said he advised the defendant of those rights, and I believe him. I don't find any overreaching, or compulsion, or threats by these officers. Statements that he made were, I'm satisfied, voluntarily made with all the awareness of [the] rights that had been administered to him. Under the totality of circumstances I'm satisfied that this motion

should be denied and those statements shall be admissible."

**24.** It should also be noted that, in accordance with this state's "humane practice rule" (*see, e.g., State v. Tassone,* 749 A.2d 1112, 1118 (R.I.2000)), the trial justice properly instructed the jury that, before it could consider the defendant's post-arrest statements as substantive evidence, it first had to determine, based on the totality of the circumstances, that the

## B. Harmless Error Analysis

In circumstances where an involuntary statement has been erroneously admitted, this Court reviews both the statement and the remainder of the evidence against the defendant to determine whether the admission of the statement constituted harmless error beyond a reasonable doubt. *Humphrey*, 715 A.2d at 1275–76; *see also State v. Bettencourt*, 763 A.2d 636, 637 (R.I.2000).

In this case, even if defendant's statements were admitted into evidence erroneously (and we do not believe that they were), any error in such admission would have been harmless beyond a reasonable doubt in light of the overwhelming additional evidence indicative of defendant's guilt.[25]

The first of the challenged statements of defendant was made in response to a question posed by Officer Deschamps with respect to the last time that he had seen his mother. Victor told Officer Deschamps that he had not done anything to her. The record discloses that there was an overwhelming amount of evidence implicating Victor in the murder of his mother and that this statement by Victor was, in effect, cumulative evidence. Indeed, before she died, Rosa herself stated that it was Victor who had attacked her. Furthermore, despite the fact that, when he made his first statement to the police, Victor denied having done anything to his mother, by the time his case came to trial, he no longer denied that it was he who had caused her death.

Assuming arguendo that this first statement was obtained in violation of defendant's *Miranda* rights, its relevance to the trial was extremely attenuated. We are convinced beyond a reasonable doubt that its admission would have been harmless error.

Victor's second statement to the police related to the cause of his obvious injuries; he said that he had incurred those injuries during a fight in downtown Providence. It is clear from the record, however, that the admission of Victor's statement in response to Officer Deschamps' inquiry constituted merely cumulative evidence, because Mr. Rivera had already testified that Victor told him that he had received the injuries as the result of "a problem downtown."

We are convinced beyond a reasonable doubt that the admission of this second statement, also would have constituted harmless error.

## IV. The Right to a Speedy Trial

The final issue that Victor raises on appeal is that he was denied his right to a speedy trial, as guaranteed to those accused of committing a criminal offense by both the federal and state constitutions. U.S. Const. Amend. VI; R.I. Const. art. 1, sec. 10. He contends that the trial justice erred in denying his pre-trial motion to dismiss for lack of a speedy trial.

Bearing in mind that historical findings of facts are reviewed only for clear error with due weight given to inferences drawn therefrom, this Court reviews *de novo* a trial justice's ultimate determi-

---

prosecution had demonstrated that the defendant was advised of his *Miranda* rights, had understood those rights, and had voluntarily waived them. *See generally State v. Killay*, 430 A.2d 418, 421 & n. 2 (R.I.1981).

25. *See State v. Humphrey*, 715 A.2d 1265, 1275–76 (R.I.1998); *State v. Benoit*, 417 A.2d 895, 901 (R.I.1980); *State v. Danahey*, 108 R.I. 291, 294–97, 274 A.2d 736, 738–39 (1971); *see generally Arizona v. Fulminante*, 499 U.S. 279, 306–12, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

nation that a defendant's constitutional right to a speedy trial has not been violated. *State v. Austin,* 742 A.2d 1187, 1193–94 (R.I.1999). In conducting its review, this Court considers the four factors set forth by the United States Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)—namely: "[1] [the l]ength of [the] delay, [2] the reason for the delay, [3] the defendant's assertion of his right, and [4][the] prejudice to the defendant." *See also State v. Zmayefski,* 836 A.2d 191, 194 (R.I.2003); *State v. Crocker,* 767 A.2d 88, 91 (R.I. 2001).

■■■ The first *Barker* factor, the length of the delay, "is a threshold consideration that triggers review of the remaining factors—but only if the delay is long enough to be considered 'presumptively prejudicial.'" *State v. Verrecchia,* 766 A.2d 377, 385 (R.I.2001); *see also State v. Bleau,* 668 A.2d 642, 645 (R.I.1995) ("If the delay is long enough to be considered 'presumptively prejudicial,' a review of the remaining three factors is required.").

This Court has held that "a delay of more than twelve months is 'presumptively prejudicial.'" *Crocker,* 767 A.2d at 92. It is undisputed that the length of the delay in the present case was more than twelve months. (Indeed, the state's brief concedes that the delay was "presumptively prejudicial.") Accordingly, that amount of delay necessitates our examination of the additional three factors outlined in *Barker;* but, as we explain below, those factors do

not sufficiently support defendant's speedy-trial claim.

As for the second *Barker* factor (*viz.,* the reason for the delay), Victor argues that the delay in this case was largely due to elements that should not be attributed to him and that should weigh against the prosecution.[26] We do not agree.

Victor was arrested in the early morning hours of August 14, 1998. On February 11, 1999, a Providence County Grand Jury returned a true bill charging him with murder, and he was arraigned on March 3, 1999. At the time of his arraignment, Victor was represented by a public defender. During the next four months, the public defender was twice unavailable to proceed and, on July 28, 1999, the court appointed a private attorney to represent Victor. As conceded by defense counsel in his brief to this Court, "[i]t then took new defense counsel approximately a year to track down all of [Victor's] past mental health records, including those from an out-of-state treating facility * * *." Thereafter, from July 21, 2000, until June 1, 2001, the case was postponed eighteen times: three times because defense counsel was excused by the court[27] and once because he was "unavailable";[28] twice because the prosecutor was on trial in another court[29] and once because defense counsel was on trial in another court;[30] twice because no Superior Court justice was available to preside over the trial at that particular time;[31] and nine times so that

---

26. The defendant does not allege (nor is there any indication to that effect in the record) that the prosecution engaged in any deliberate delay.

27. July 21, 2000, February 20, 2001, and April 12, 2001.

28. August 29, 2000.

29. September 7, 2000 and January 30, 2001.

30. April 5, 2001.

31. November 14, 2000 and January 16, 2001.

We have previously stated that "[a]lthough court congestion is weighed against the state, it is not weighed so heavily as deliberate delay." *State v. Macaskill,* 523 A.2d 883, 885 (R.I.1987); *see also State v. Hernandez,* 641 A.2d 62, 68 (R.I.1994).

"further investigation" could be conducted.[32] The record further reveals that during the above-referenced period, the court granted two motions submitted by the prosecution which sought to compel defense counsel to respond to an outstanding discovery request.[33]

In denying Victor's pretrial motion to dismiss for lack of a speedy trial, the trial justice found that "[a] great bulk of the time that was consumed * * * was used to collect medical and psychiatric materials that were out of State." He further found that "part of the time was used so [that] the defendant could indeed and in fact secure a witness that would act as his expert." We perceive no error in those findings. Accordingly, in view of the fact that a significant portion of the delay in this case was attributable to the preparation of Victor's own defense, we conclude that he bears primary responsibility for the delay in this case and that he has failed to satisfy the second *Barker* factor.

We next consider the third *Barker* factor—that is, whether Victor asserted his right to a speedy trial. We have previously stated that "when assessing a defendant's assertion of his right to a speedy trial, this Court looks for actions sufficiently aggressive to constitute the equivalent of a 'banging on the courthouse doors.'" *Bleau*, 668 A.2d at 645 (quoting *State v.*

*Powers*, 643 A.2d 827, 833 (R.I.1994) and *Tate v. Howard*, 110 R.I. 641, 656, 296 A.2d 19, 27 (1972)).[34] The record reveals that, although defendant did file a motion for a speedy trial on September 24, 1999, he concedes in his brief to this Court that he was unprepared to proceed to trial at that time.[35] Furthermore, defendant's later failure to respond to the prosecution's discovery requests, thereby hampering the prosecution's preparation of its case, can hardly be considered to be consistent with "banging on the courthouse doors." *Bleau*, 668 A.2d at 645.

With respect to the fourth and final *Barker* factor, Victor contends that, even though "there was not any particular witness that could not be located as a result of the delay," the fact that he was held without bail as he was awaiting trial is enough to demonstrate that he suffered prejudice. We do not agree that Victor has sufficiently demonstrated prejudice for the purpose of our analysis under *Barker*. As we have stated previously, "to the extent that incarceration disrupts one's freedom, employment, and familial associations, * * * this disruption merely constitutes a prejudice inherent in being held while awaiting trial" and is insufficient alone to satisfy the fourth and final *Barker* factor. *State v. Austin*, 643 A.2d 798, 801 (R.I.1994). Furthermore, although Victor was initially held without

32. August 2, 2000, August 22, 2000, September 26, 2000, October 4, 2000, October 11, 2000, October 26, 2000, November 21, 2000, February 20, 2001, and March 9, 2001.

33. On October 19, 2000, and again on March 8, 2001, the court entered orders granting the prosecution's motions to compel. (Defense counsel did not respond to the discovery request that was the subject of those orders until approximately one month before the trial began.)

34. In his opinion for the Court in *Tate v. Howard*, 110 R.I. 641, 656, 296 A.2d 19, 27

(1972), Justice Kelleher originated the useful "banging on the courthouse doors" metaphor when he observed that it was clear that the accused in that case "was figuratively banging on the courthouse doors asking that he be heard * * *. He demanded and redemanded that he be brought to trial."

35. As noted above, the attorney who represented Victor at trial entered his appearance on August 3, 1999, and then spent approximately one year investigating (*inter alia*) Victor's health records to prepare for trial.

bail, the record reveals that, on September 15, 2000, a Superior Court hearing justice granted defense counsel's motion for admission to bail and set bail at $300,000 with surety.

After balancing all of the relevant factors and considering them as a whole, we conclude that Victor's right to a speedy trial was not infringed upon and that the trial justice properly denied his motion to dismiss to the extent that it was based on this contention.

## Conclusion

For the reasons stated, the judgment of the Superior Court is affirmed. The record may be remanded to the Superior Court.