DECISION
This matter is before the Court on Defendant's motion to suppress two statements taken from the Defendant on April 16, 2005, at the Rhode Island Hospital and the Providence Police Department on April 17, 2005.
The thrust of the Defendant's argument is based on three assertions:
 1. That the Defendant's physical and mental impairment rendered Defendant unable to give a voluntary statement to the police after his arrest.
 2. That the audio-tape recording of the statement from Rhode Island Hospital indicates that the Defendant was not made aware of his rights under Miranda v. Arizona, 384 U.S. 436 (1966) prior to his questioning by the police officer.[1]
 3. Although not concisely expressed, the Defendant's third challenge goes to his statement elicited at the Providence Police Department by Detective Sergeant Vincent Mansolillo (Mansolillo) where the Defendant expressed a fear that "the Devil would jump into [Mansolillo's] body" and that "Detective Mansolillo also recalled receiving a phone call from the Defendant's mother advising him that the Defendant recently sought mental health treatment and that she believed he suffered from mental disease."
 Travel
On April 15, 2005, the Defendant became a suspect in alleged crimes committed on an elderly woman in the North End of Providence. That investigation focused on the Defendant because of certain eyewitness reports. Police officers were dispatched to the area and returned with the Defendant to the Providence police station. He was to be questioned by Detective James Allen (Allen). The Defendant was taken to a conference room where Detective Allen was located. (R.H. at p. 10)[2] The evidence indicates that at least two other officers were in the room at the time but both left; one temporarily to obtain a cup of water requested by the Defendant. Detective Allen and Defendant were now alone. Within seconds after the officer retrieving the water left the conference room, he heard shots fired from inside, a commotion, and Detective Allen's voice loudly expressing a fear that he was going to be killed. The officer rushed to return to the room but it was locked from the inside. Ultimately the door was forced open, Detective Allen was found mortally wounded; the Defendant was gone. It is alleged that Detective Allen was killed with his own weapon.
It should be noted that the conference room is located on the third floor of the building. A superior officer's office stands next to the conference room and in that room is a window to the outside. That window was either shot out or broken through after the altercation. The incident generated a massive investigation by the police. The investigation centered on Esteban Carpio.
 Statement at Rhode Island Hospital on April 16, 2005
Detective John Finegan (Finegan), a twenty-two year veteran of the department with seventeen years of detective experience, was on duty that evening assigned to investigate another shooting in another area of the City. (Supp. 93.) During the course of that activity, he received a transmission that all units were to respond to central station. It was around midnight. (Supp. 97.) He responded immediately and arrived within minutes. It was there that he was informed that a shooting occurred in the police department. (Supp. 98.) Detective Finegan observed a window that had been smashed out from the third floor of the building and saw the glass on the embankment below. (Supp. 100.) Upon approaching the embankment, Finegan observed a semi-automatic handgun lying on a grated portion a foot away from the building directly under the broken window. (Supp. 102.) The Providence police building was secured and a broadcast issued for the Defendant with his physical description and that of his attire.
Possessed of that information, Detective Finegan and other officers commenced a search for the Defendant. Finegan and several other officers began searching between a service road and Route 95, southbound. (Supp. 104.) Detective Finegan was on foot. At this point he received a transmission that the Defendant suspect may be in the area of Empire Street. (Supp. 105.) In response to this, Finegan ran to his police vehicle and drove — alone — to the area of Empire and Washington Streets in Providence. (Supp. 105.) When he approached, he observed several officers on the ground with the suspect trying to subdue him. (Supp. 107.) The suspect Defendant was on the ground, one arm cuffed with his other underneath him. Numerous commands were issued for Defendant to bring his other arm around, but the Defendant refused. (Supp. 107.) Eventually the officers succeeded handcuffing both hands and the Defendant was brought to his feet. (Supp. 107.)
Detective Sergeant Michael Sweeney (Sweeney) was also on the scene at this time and instructed Finegan to go to Rhode Island Hospital, with additional instructions not to allow anyone to speak with Carpio except himself (Detective Finegan). (Supp. 107.) In accordance with Sergeant Sweeney's direction, Detective Finegan immediately drove to the hospital, stationing himself in the trauma room area. (Supp. 111.) The Defendant arrived at the trauma unit according to Finegan about twelve minutes after 1:00 A.M. He was brought in by rescue, handcuffed, face down to a gurney. (Supp. 112.) Medical staff immediately took over and Carpio was placed in trauma room numbered one, and treatment commenced. A CAT scan was conducted. In accordance with his orders, Detective Finegan accompanied the Defendant with medical personnel into the CAT scan facility.
It is patently clear here that at no time during the Defendant's treatment at the hospital did Detective Finegan or any other officer interfere with or interrupt the care and treatment of the Defendant's condition, nor does the Defendant assert that there was. A second CAT scan was ordered and again Finegan attended. (Supp. 117.) The Defendant returned to trauma room one at about 2:00 A.M. Detective Finegan apparently intending to elicit a statement from Carpio advised him of hisMiranda rights. (Supp. 118.)
Carpio was laying on a bed, Finegan to his left. Sergeant Sweeney was present standing behind Finegan to his right. The full panoply of rights was read from a pre-printed card Finegan had in his possession. (Supp. 118-120.) Upon completing the formal admonitions of Miranda, Finegan asked Carpio "Do you understand your rights. Is that correct?" (Supp. 120.) Carpio in response nodded his head up and down and clearly said "yes" according to Finegan. (Supp. 121.) Sergeant Michael Sweeney, who was in the room at that time, verified that the Miranda
warnings were rendered to the Defendant in his presence. (Supp. 186.) Additionally at this time Nurse Ellen Deveney, who was attending to Carpio, was also present. Her testimony was that she heard police officers or a police officer speak directly to the Defendant. (Supp. 29.) She was at the trauma room desk and heard the officer tell Carpio "You have the right to remain silent." (Supp. 29.) She stated she made a mental note of the time because "it's just like on TV." (Supp. 30.) Although Nurse Deveney didn't hear all of the warnings provided, her testimony is corroborative of that of Finegan and Sweeney. She didn't recall the Defendant saying anything in response. However to her best observation, he was alert throughout the entire time the officer was speaking to him, and at no point did she have any concern that the questioning had any impact on Carpio's medical condition. (Supp. 32, 33, 35.) At the time the rights were administered, they were given orally without the benefit of an audio or visual recording. The testimony of Detective Finegan, however, informed the Court that around 3:00 A.M. he was provided with a digital voice recorder by Detective Sergeant Vincent Mansolillo who brought it with him when he reported for duty at the hospital. (Supp. 202-204.) Detective Finegan utilized, although somewhat unfamiliar with its operation, the recorder during the remaining part of the interview of Carpio. The CD/ROM from the recording and the transcription thereof are in evidence. (See Ex. 2 3.) The Defendant in his memorandum contends, "Moreover, the audio tape recording from Rhode Island Hospital indicates that the Defendant was not made aware of his rights under Miranda prior to questioning by the Providence Police." Certainly the warnings are not reflected on exhibits 1 2. This does not nevertheless invalidate the statement inasmuch as the rendering and waiver was attested to in full and in part by three witnesses this Court has determined were competent and credible. This Court knows of no statutory or decisional law which would require Miranda rights to be memorialized by recording. It may be appropriate in some circumstances, but not mandated. Thus, this Court finds based upon the credible and competent testimony of Detective Finegan, Detective Sergeant Sweeney, and Nurse Deveney, the Miranda
requirements were properly dispensed to the Defendant prior to his hospital statement.
That conclusion, nevertheless, does not complete the analysis since the Defendant raises the Defendant's ". . . physical and mental impairment . . ." as a bar to admissibility since it ". . . rendered him unable to give a voluntary statement to the police following his arrest."
The Miranda decision calcified the proposition that when a suspect is in custodial possession of the police no statements will be taken from the accused until he is forewarned in accordance with that decision. State v. Perez, 882 A.2d 574
(R.I. 2005); State v. Marini, 638 A.2d 507 (R.I. 1994).
Further, the admissibility of Defendant's confession rests not only on compliance with the Miranda admonitions, but on its voluntariness. State v. Marini, supra.
Here, the Defendant argues that his physical and mental condition at the time of the interrogation abrogates the statement's voluntary rendition. The facts must be examined.
The Defendant was arrested in a struggle with certain Providence police officers in the area of Washington and Matthewson Streets. Because of his resistance to being handcuffed, some blows were obviously struck by some officers but whatever they were; there is no evidence that the Defendant suffered any incapacitation at that time. The police, in particular Detective Sergeant Sweeney, was concerned about possible abuse and immediately ordered "no unnecessary force to be used here. Just get him in handcuffs." (Supp. 181.)
There is no dispute that the alleged events leading to the death of Detective Allen took place on the third story of the Providence police station. The Defendant maintains that he was in an altercation with the Detective and in an effort to protect himself, he either fell or jumped out that third story window and remembered hitting his head on the concrete after the fall. (R.H. 141-5.) Because of the injuries sustained, Carpio was taken, by rescue, to the hospital and located in trauma room one, where treatment was initiated. A neck collar was applied to stabilize his cervical spine; he was placed on monitors to record heart beat and blood pressure and pulse oximetry. Intravenous lines were applied and blood was drawn (Supp. 8 9.) The Defendant had lacerations over his left eye and a fracture over the left front part of his head. (Supp. 9.) Certain drugs were administered; ancef, an antibiotic; and 0.5 milligrams of dilaudid, a pain medication. Nurse Deveney testified that neither of the medications given had any noticeable impact on his alertness or awakeness. (Supp. 17.)
Additionally upon the Defendant's admission to the hospital, about 1:15 A.M., the medical team instituted a procedure to determine the Defendant's trauma score. As explained by Nurse Deveney, its purpose is to determine whether there could have been a head injury or not or whether the patient was compromised in any way. (Supp. 21; see also Ex. 1.) As the Court understands it, inclusive in the trauma scale assessment is another observational test called the Glasgow Coma Scale. (Supp. 22.) That test consists of three separate categories; spontaneous eye opening, the best verbal response and best motor response. Systolic blood pressure and respiration rate are also considered. Apparently, these categories are rated by number then added to determine the patient's score. The highest number achieved favors the patient's health. Nurse Deveney testified that she assisted in compiling the Defendant's revised trauma score and the Defendant achieved the best possible score, a twelve out of twelve. (Supp. 25 26.) This determination included observations in accord with Glasgow Coma Scale. (Supp. 26.) Nurse Deveney determined the results to be within the acceptable range for a person in Carpio's condition at the time. Her testimony in this regard was frank and candid "Those are stable vital signs." (Supp. 27.) Nurse Mandy Guerin, also assigned to the trauma team, confirms Deveney's observations regarding his condition, treatment and tests provided to Carpio and came to the same conclusion that no medical intervention was necessary — he was stable. (Supp. 55, 56, 58, 62 69.) Nurse Guerin further clarifies the proposition put forth by the Defendant in his memorandum that he suffered a broken leg. Her testimony was that he sustained a "nondisplaced" fracture which means "that the bone is sitting next to itself like it is suppose to be." (Supp. 77 
78.)
The Defendant laments in his argument that at the time of the interrogation Detective Finegan determined that Carpio was capable of voluntarily participating in a coherent conversation and able to answer his questions, but he was unaware of the extent to which Carpio was medicated or of the nature of his injuries and repeatedly encouraged the Defendant to open his eyes, to remain awake and conscious, and to respond to the questions. It assists this Court to remember the testimony of the two nurses that all vital signs were stable.
Moreover, the central issue here is not encouragement or prompting by the officer, but whether Detective Finegan's actions were coercive. In Colorado v. Connelly, 479 U.S. 157 (1986), the Supreme Court of the United States ruled that coercive police activity is a necessary predicate to finding that a confession is not "voluntary" within the meaning of the due process clause.Colorado v. Connelly, supra.
To determine the voluntariness of a waiver of Miranda rights, it is necessary to look at the totality of the circumstances, including the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might cause his or her will easily to be overborne. U.S. v. Palmer,203 F.3d 55 (1st Cir. 2000); U.S. v. Rohrbach,813 F. 2d, 142, 144 (8th Cir. 1987); U.S. v. Jackson, 918 F.2d 236, 241 (1st Cir. 1990). The Defendant alludes that Detective Finegan repeatedly asked the Defendant to open his eyes, to remain awake and to respond to the questions. A review of the Rhode Island Hospital transcript indicates in part the comments of Detective Finegan:
 "Esteban, stay with me, allright?" (R.H. 1.) "Esteban stay with me. Stay with me." (R.H. 8.) "Stay with me, Esteban. Stay with me, Okay? That's it. Keep your eyes open, Esteban. Try to focus. Try to focus Esteban. That's it." (R.H. 19.)
A few other similar remarks by Finegan are sprinkled throughout. The Court finds them of no consequence.
The Court considers also the following statements from the transcript that:
 1. Finegan assisted Defendant in loosening the collar. (R.H. 21 33.)
 2. The Defendant asked for Finegan on one occasion. (R.H. 24.)
 3. The Defendant tells Finegan: "I just want to tell you what happened to me. (R.H. 25.)
 4. Finegan assists in providing water for the Defendant. (R.H. 28 40.)
 5. The Defendant tells Finegan: "I need to sit up and talk to you." (R.H. 29.)
The transcript and CD Rom reveals that Detective Finegan appeared to be a professional police officer. There is not a scintilla of evidence that he was rude, abrasive or forceful. In fact, the interview displays a very cooperative relationship between Carpio and Finegan.
Of further paramount significance is the fact that the Defendant never advantaged himself of the rights given; he never asked for an attorney; never refused to answer questions; never asked the interrogation to cease; and never asserted his right to silence. The Court also takes into consideration the Defendant's prior contacts with law enforcement and finds from the totality of circumstances demonstrated that the will of Esteban Carpio was certainly not overborne.
 Statement at Providence Police Department on April 17, 2005
On April 17, 2005, at 10:13 A.M., Detective Sergeant Mansolillo, along with Detective John Finegan, arranged for and in fact took a second statement from Esteban Carpio at Providence police headquarters. Obviously, the Defendant had been discharged from further treatment at the hospital. Almost immediately the Defendant's rights under Miranda, supra, were conveyed to him by Sergeant Mansolillo in the presence of Detective Finegan. (Ex. 6, pp. 3, 4.) The Defendant evidently conceded that fact and makes no challenge. Again, it should be noted that during the entire period of questioning did the Defendant endeavor to make even an effete attempt to assert any of them.
Nevertheless, the Defendant seems to rest his efforts on two factors:
 1. That Carpio, during his interview with Mansolillo, expressed a fear that "The Devil would jump into [Mansolillo's] body. (Supp. 224.)
 2. The fact that Sergeant Mansolillo recalled receiving a telephone call, purportedly from the Defendant's mother advising him that Defendant had recently sought mental health treatment and she believed he suffered mental disease.
The Court addresses the second factor first and rejects it as being without relevance or merit to this motion, State v.Lorenzo, No. 2004-302-C.A. (R.I.Sup.Ct. 2/26/06); State v.Squillante, 622 A.2d 474 (R.I. 1993).
The Defendant's other exertions here are meager. In the Court's reading of the transcribed statement in conjunction with the testimony of Sergeant Mansolillo, it can only conclude that the interrogation was calm, considered, and deferential to the Defendant — almost friendly.
The following is indicative:
 1. Defendant complains his right handcuff is too tight. (Ex. 6, p. 1.)
 2. At Defendant's request, the cuff is removed. (Ex. 6, p. 2.)
 3. Defendant asked for water and it was provided. (Ex. 6, p. 2.)
 4. Defendant responds twice that he understands his rights. (Ex. 6, p. 4.)
 5. Defendant knows he is charged with murder. (Ex. 6, p. 4.)
 6. Defendant is offered and given a cigarette by Mansolillo, along with water. (Ex. 6, pp. 19, 27.)
 7. Defendant is given another cigarette and tells Mansolillo his brand is Newport. (Ex. 6, p. 29.)
The tone of the interview is peppered with this type of amicable repartee between Sergeant Mansolillo and the accused. If the Defendant is attempting to convince the Court that his "Devil comments" to Sergeant Mansolillo should induce it to accept that at the time he was somehow mentally deficient or unable to grasp the reality of his situation, the tone of the interview belies that assertion. The test, of course, is that the Court must find that alleged mental impairment caused Defendant's will to be overborne. U.S. v. Casals, 915 F.2d 1225 (8th Cir. 1990). Additionally, except for the "Devil" comment, no evidence was submitted by the Defendant in support. The Defendant cannot argue, and does not argue, coercive conduct on the part of the officers because the statement of April 17, 2005 is clearly barren of any such conduct. Sergeant Mansolillo and Detective Finegan are two highly experienced officers. Their conduct was professional without any hint that they were rude, abrasive or unduly forceful. As this Court sees it, they treated the Defendant with deference and on occasion kindness. Considering the totality of circumstances of the event, the motion to suppress the April 17, 2005 statement is denied.
Finally, at the conclusion of the suppression hearing, counsel for the Defendant moved to admit the Defendant's prior medical records from the Faulkner Hospital and the Providence Center for the Court's consideration. The Court accepted them de bene in order to determine admissibility. They are irrelevant and immaterial. This admission is denied. State v. Lorenzo, supra;State v. Squillante, supra.
 Conclusion
For reasons stated above, the Court finds that the Defendant has no claim in law or logic to grant his motions. Therefore, motions to suppress both statements are denied.
[1] The Defendant apparently concedes that the Miranda
warnings were provided at the Providence Police Department on April 17, 2005, but challenges on other grounds (see above).
[2] The Court will reference three transcriptions in this matter: Suppression Hearing (Supp), Statement taken at Rhode Island Hospital (R.H.), and the Statement taken at the Providence Police Department (PPD).